CRAIN, J.
|2In this medical malpractice proceeding, the plaintiffs appeal judgments that sustained an exception of res judicata, granted a motion in limine, and granted summary judgment in favor of the defendants. We reverse the judgment granting the exception of res judicata, affirm in part and reverse in part the judgment granting the motion in limine, reverse the summary judgment, and remand for further proceedings.
FACTS AND PROCEDURAL HISTORY
This litigation began approximately twenty-four years ago when the plaintiff, *407 Janie Jones, individually and on behalf of her minor daughter, Destinee Jones, filed a petition against Dr. William Black and his insurer, Louisiana Medical Mutual Insurance Company (LAMMICO), alleging that Dr. Black breached the standard of care during the birth and delivery of Des-tinee. More particularly, Jones alleged that Dr. Black was negligent in the use of forceps during the delivery, and as a result, Destinee suffered a permanent loss of vision in her right eye. Jones also alleged that Dr. Black failed to inform her of the material risks associated with the use of forceps during the delivery.
The matter proceeded to a jury trial beginning on January 19, 1993, where Jones presented testimony from numerous witnesses, including Dr. William J. Cameron, an obstetrician and gynecologist, and Dr. Peter R. Kastl, an ophthalmologist, in support of her claim that Dr. Black negligently used the forceps and that his negligence caused Destinee to sustain a hemorrhage behind her right eye, referred to as a “retrobulbar hemorrhage.” The defendants countered with testimony from Dr. Black and other medical experts, including an obstetrician/gynecologist and two pediatric ophthalmologists, together with the medical review panel opinion in favor of Dr. Black and other documentary evidence. At the conclusion of the trial, the jury returned a verdict finding that Dr. IsBIack’s conduct fell below the applicable standard of care and that his conduct caused Destinee to suffer a retrobulbar hemorrhage as well as abrasions and/or lacerations. The jury awarded a total of $100,000.00 in general damages and no special damages. Thereafter, the trial court entered a judgment notwithstanding the verdict that modified the damages but did not increase the total award.
On appeal, this court found that the jury verdict was tainted by the trial court’s efforts to encourage the jury to reach a verdict; and, as a result, this court conducted a de novo review of the evidence. Jones v. Black, 94-1505 (La.App. 1 Cir. 9/22/95) (unpublished opinion). Based upon that review, this court held that Jones failed to prove that negligence by Dr. Black caused Destinee’s injury. Accordingly, the judgment on the jury verdict and the judgment notwithstanding the verdict were reversed.
The supreme court granted writs and in a per curiam opinion agreed that the trial court’s action tainted the jury verdict, but the supreme court vacated the decision of this court and remanded for a new trial, stating:
After taking the unusual step of sending for and reviewing the entire record in this case, we are convinced that this case is one in which the weight of the evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the issues.
Jones v. Black, 95-2530 (La.6/28/96), 676 So.2d 1067 (quotation marks and citation omitted).
Several years after the remand and with a new trial date pending, the defendants filed an exception of res judicata, a motion in limine, and a motion for summary judgment. In the exception of res judicata, the defendants contended that a ruling made by the trial court during the prior trial precluded any argument, testimony, or other evidence of informed consent at the new trial. The ruling at issue was rendered at the conclusion of the evidence in the first trial, when the trial court determined that it was “not going to allow the issue of [informed] consent to [4go to the jury.” The defendants argued that this ruling became final and binding because Jones did not appeal or assign error to it in connection with the appeal of the prior judgment on the merits.
*408 In the motion in limine, the defendants sought to exclude any testimony from Dr. Cameron, Dr. Kastl, and Dr. Frederick Gonzalez, an expert retained by Jones after the case was remanded for a new trial. According to the defendants, Dr. Cameron was not qualified to render an opinion on the standard of care or causation, and Dr. Gonzalez, an obstetrician and gynecologist, lacked the necessary expertise to render an opinion concerning the cause of the retrobulbar hemorrhage. As to Dr. Kastl, the defendants argued that his testimony was not definitive because he identified two possible causes of the retrobulbar hemorrhage: the forceps or the forces/pressures of labor. Therefore, the defendants asserted that Dr. Kastl’s testimony “does not cany the burden of proof on the issue of causation” and should be excluded. The defendants also maintained that Dr. Kastl had “no peer-reviewed medical literature or studies” to support his opinion that the forceps were a possible cause of the injury.
In anticipation of a favorable ruling on the motion in limine, the defendants filed a motion for summary judgment asserting that Jones could not establish the requisite elements of her case against Dr. Black, specifically the element of causation.
After a hearing on the exception and motions, the trial court granted the exception of res judicata and entered a judgment precluding Jones from presenting any argument, testimony, or other evidence on the issue of informed consent at the trial. The court continued consideration of the motion in limine until a subsequent hearing date and denied the motion for summary judgment. After the ensuing hearing, the trial court granted the motion in limine and entered a judgment that precluded Jones from presenting any testimony of Dr. Cameron, Dr. Gonzalez, or 15Pr. Kastl at the trial of the matter.
Thereafter, the defendants re-urged their motion for summary judgment, which the trial court granted. In accordance therewith, the trial court entered a judgment that dismissed Jones’ claims against Dr. Black and-LAMMICO with prejudice.
Jones appeals and asserts three assignments of error: (1) the trial court erred in finding that the informed consent claim is barred by reversed and vacated judgments under the doctrine of res judicata, (2) the trial court erred in excluding the testimony of the medical experts on the grounds that they were unqualified and used unscientific methods, and (3) the trial court erred in finding that there were no genuine issues of material fact that precluded summary judgment.
LAW AND ANALYSIS
A. Exception of Res Judicata
The burden of proving the facts essential to sustaining an exception of res judicata is on the party pleading the exception. Union Planters Bank v. Commercial Capital Holding Corp., 04-0871 (La.App. 1 Cir. 3/24/05), 907 So.2d 129, 130. If any doubt exists as to its application, the exception of res judicata must be overruled and the second lawsuit maintained. Pieirotti v. Johnson, 11-1317 (La.App. 1 Cir. 3/19/12), 91 So.3d 1056, 1063. The concept should be rejected when doubt exists as to whether a plaintiffs substantive rights actually have been previously addressed and finally resolved. Patin v. Patín, 00-0969 (La.App. 1 Cir. 6/22/01), 808 So.2d 673, 676. The res judicata effect of a prior judgment is a question of law that is reviewed de novo. Pierrotti, 91 So.3d at 1063.
Although the law of res judicata underwent a substantial revision in 1990, the law in effect prior to that revision applies in the present matter because the *409 petition was filed before January 1, 1991, the effective date of the act. See La. Acts 1990, No. 521, § 5. Nevertheless, under both the pre-amendment and postjamend-ment6 version of the law, an essential requirement to the application of res judica-ta is a “final judgment.” See Preis v. Standard Coffee Service Company, a Division of W.M. B. Reilly and Company, Inc., 545 So.2d 1010, 1012-13 (La.1989) (pre-amendment); La. R.S. 13:4231 (after amendment by La. Acts 1990, No. 521, § 1). A “final judgment” is one that “determines the merits in whole or in part.” La.Code Civ. Pro. art. 1841. As explained hereinafter, the absence of a final judgment in this proceeding is fatal to the defendants’ argument that the doctrine of res judicata prevents Jones from pursing her claim of lack of informed consent.
The defendants do not contend that the judgment on the jury verdict or the judgment notwithstanding the verdict are final judgments, as both of those judgments were reversed in an opinion by this court, which was later vacated by the supreme court. See Jones, 676 So.2d at 1067. The supreme court’s decision to remand the case for a new trial effectively vacated the prior judgments by the trial court, so those judgments cannot constitute final judgments. See La. R.S. 13:4231, Comment (d) (“The use of the phrase ‘final judgment’ also means that the preclusive effect of a judgment attaches once a final judgment has been signed by the trial court and would bar any action filed thereafter unless the judgment is reversed on appeal ”) (Emphasis added).
Instead, the defendants argue that Jones’ informed consent claim was “effectively dismissed” by the trial court and that Jones “abandoned” the claim because she did not assign any error to the trial court’s ruling in the original appeal pursuant to Rule 2-12.4 of the Uniform Rules of the Courts of Appeal. This contention ignores that a judgment was never entered by the trial court that dismissed Jones’ informed consent claim. Rather, the trial court ruled that the jury would not be instructed on the informed consent claim. The denial of a jury instruction is an interlocutory ruling rather than a final judgment because it does |7not determine the merits in whole or part. See La.Code Civ. Pro. art. 1841; Miller v. Upjohn Co., 461 So.2d 676, 677 (La.App. 1 Cir.1984). An interlocutory judgment cannot serve as the basis for a plea of res judicata. Saizan v. Pointe Coupee Parish School Board, 10-0757 (La.App. 1 Cir. 10/29/10), 49 So.3d 559, 563, writ denied, 10-2599 (La.1/14/11), 52 So.3d 905.
The defendants alternatively contend that the principle of “issue preclusion” set forth in revised Louisiana Revised Statute 13:4231(3) is applicable and bars re-litigation of an “issue actually litigated and determined if its determination was essential to that judgment.” See also La. R.S. 13:4231, Comment (b). However, prior to the 1990 amendment to Section 4231, Louisiana did not recognize the principle of “issue preclusion,” sometimes referred to as “collateral estoppel,” in the law of res judicata. See La. R.S. 13:4231, Comment (b) (“R.S. 13:4231 also changes the law by adopting the principle of issue preclusion”) (emphasis added); Welch v. Crown Zellerbach Corporation, 359 So.2d 154, 157 (La.1978) (holding that the common law version of res judicata permitting “collateral estoppel” was not applicable in Louisiana). Accordingly, under the law applicable to this case, the doctrine of issue preclusion is not available to the defendants, and their reliance on revised Section 13:4231(3) has no merit.
In a final argument in support of the exception of res judicata, the defen *410 dants contend that under the “law of the case” doctrine, the trial court’s ruling is binding during the latter stages of the case. Under this doctrine, courts of appeal have held that they have discretion to not reconsider their own rulings of law on a subsequent appeal in the same case. Garrison v. St. Charles General Hospital, 03-0423 (La.4/25/03), 845 So.2d 1047 (per curiam). However, the doctrine does not apply in the context of a trial court ruling on interlocutory issues. Land v. Vidrine, 10-1342 (La.3/15/11), 62 So.3d 36, 42. For this reason, the trial court’s | ¡¿interlocutory ruling denying a jury instruction on informed consent is not binding on Jones in the new trial under the law of the case doctrine.
Absent a final judgment, the exception of res judicata has no basis, and the trial court erred in sustaining the exception and precluding Jones from presenting any argument, testimony, or other evidence on the issue of informed consent at the trial.
B. Motion in Limine
Jones next asserts that the trial court erred in granting the motion in limine and excluding any testimony from Dr. Cameron, Dr. Gonzalez, and Dr. Kastl on the grounds that they were unqualified and used unscientific methods.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. La.Code Evid. art. 702. In Cheairs v. State ex rel. Department of Transportation and Development, 03-0680 (La.12/3/03), 861 So.2d 536, 542, the Louisiana Supreme Court adopted the following three part inquiry For determining whether the admission of expert testimony is proper:
1. Is the expert qualified to testify competently regarding the matters he intends to address?
2. Is the methodology by which the expert reaches his conclusions sufficiently reliable as determined by the sort of inquiry mandated in Daubert ? [1]
3. Will the testimony assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue?
The trial court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. Breitenbach v. Stroud, 060918 (La.App. 1 Cir. 2/9/07), 959 So.2d 926, 936, As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. Breitenbach, 959 So.2d at 936.
A trial court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. Cheairs, 861 So.2d at 541. An appellate court should not disturb a trial court’s evidentiary ruling on the admissibility of expert opinion evidence at summary judgment absent an abuse of discretion. MSOF Corp. v. Exxon Corp., 04-0988 (La.App. 1 Cir. 12/22/05), 934 *411 So.2d 708, 717, writ denied, 06-1669 (La.10/6/06), 938 So.2d 78.
1. William Cameron
Dr. Cameron was tendered as an expert in the area of obstetrics and gynecology. In the motion in limine, Dr. Black challenged Dr. Cameron’s qualifications as an expert as to the standard of care relating to forceps deliveries and whether Dr. Black breached the standard of care under the facts of this case. The trial court agreed and found that Dr. Cameron was not familiar with the standard of care applicable to Dr. Black.
A challenge to an expert’s qualifications falls within the first prong of the Cheairs inquiry and does not involve a Daubert analysis. See Robertson v. Doug Ashy Building Materials, Inc., 10-1552 (La.App. 1 Cir. 10/4/11), 77 So.3d 339, 355, units not considered, 11-2432, 11-2433 (La.1/13/12), 77 So.3d 973, 974, units denied, 11-2468, 11-2430 (La.1/13/12), 77 So.3d 972, 973 (“Daubert concerns admissibility of the expert’s opinion and not his qualifications as an expert in the area tendered.”)
Dr. Cameron confirmed in his deposition that he graduated from the University of Michigan Medical School and trained in obstetrics and gynecology at |10the University of Kansas. After completing his training in 1961, he obtained board certification in the field of obstetrics and gynecology. He became a full professor of obstetrics and gynecology at the University of Kansas, where he also served as vice-chairman of the department of obstetrics and gynecology for 16 years through the date of the deposition. From 1961 through 1988 Dr. Cameron delivered approximately 75 babies a year. He used forceps in approximately 50 percent of the deliveries until about 1980, when the percentage decreased to about ten percent because of the increasing popularity of “so-called natural childbirth.” He further confirmed that he authored , approximately twenty articles published in medical journals, and he had qualified as an expert in the specialty of obstetrics and gynecology numerous times without ever being rejected as an expert.
Dr. Black challenged Dr. Cameron’s qualifications as an expert in obstetrics on the basis that Dr. Cameron was no longer delivering babies at the time of his trial deposition. Dr. Black also asserted that 90% of Dr. Cameron’s practice at the time of his deposition involved gynecology and not obstetrics, and that his publications were in the field of gynecology and did not address the use of forceps in deliveries.
While this information may go to the weight of Dr. Cameron’s opinion, none of these contentions rises to the level of disqualifying him as an expert in the field of obstetrics and gynecology. Dr. Cameron confirmed that he was board certified and had approximately 30 years of experience in the field of obstetrics and gynecology. Based upon his estimated number of deliveries per year, Dr. Cameron delivered over two thousand babies from 1961 through 1988, and a substantial number of those deliveries involved the use of forceps. The record contains no reasonable basis for the trial court’s conclusion that Dr. Cameron was not familiar with the applicable standard of care for delivering a baby with the use of forceps at the time of the subject delivery in 1988. To the contrary, Dr. Cameron’s | n education, training, and experience clearly qualified him as an expert as tendered in the field of obstetrics and gynecology: See Bradbury v. Thomas, 98-1678 (La.App. 1 Cir. 9/24/99), 757 So.2d 666, 674-675 (physician who was board certified in obstetrics and had practiced for 30 years in obstetrics and gynecology was properly accepted as expert in field of *412 obstetrics and gynecology). The trial court abused its discretion in excluding Dr. Cameron as an expert witness and precluding Jones from presenting any of his testimony.
However, as to the specific issue of causation, the trial court did not abuse its discretion to the extent the judgment prohibited any testimony from Dr. Cameron about the cause of the retrobulbar hemorrhage. Dr. Cameron repeatedly acknowledged that he was not an expert in the causes of a retrobulbar hemorrhage, as confirmed by the following excerpts from his deposition:
Q. And you are not an expert in pediatric ophthalmology, are you?
A. No.
Q. You are also not a specialist in the causes of retrobulbar hemorrhage, are you?
A. No.
Q. And that area, the cause of retro-bulbar hemorrhage, is the area of a pediatric ophthalmologist?
A. Well, ophthalmology.
[[Image here]]
Q. Retinal hemorrhages can also occur without any negligence or wrongful action by a physician; is that correct?
A. I don’t know about retinal hemorrhages ...
Q. That’s something that’s outside your expertise—
A. That’s right.
[[Image here]]
Q. If I understood your earlier testimony, you are not a specialist in the cause of retrobulbar hemorrhage; is that correct?
li?.A. Right.
Q. That determination of the cause of retrobulbar hemorrhage is within the specialties of an ophthalmologist or in this case a pediatric ophthalmologist; is that correct?
A. I would think so.
[[Image here]]
Q. You are not an expert in the cause of retrobulbar hemorrhage; is that correct?
A. That’s right.
Based upon this testimony, the trial court did not abuse its discretion to the extent it found that Dr. Cameron was not qualified to render an opinion about the cause of Destinee’s retrobulbar hemorrhage. Therefore, we affirm the trial court’s judgment insofar as it precluded any testimony from Dr. Cameron about the cause of the retrobulbar hemorrhage.
2. Dr. Frederick Gonzalez
Dr. Gonzalez graduated from Columbia University College of Physicians and Surgeons in 1976 and completed a four-year residency in obstetrics and gynecology at Downstate Medical Center in Brooklyn, New York. He is board certified in obstetrics and gynecology and is a fellow of the American College of Obstetrics and Gynecology, He also completed a three-year fellowship in maternal and fetal medicine and is board certified in that subspecialty. He has over 27 years of practice with experience and training in the use of forceps; and in 1988, around the time of the subject delivery, he was delivering about 300 babies a year. In connection with his opinions in this matter, Dr. Gonzalez reviewed documentation that included the medical records associated with the delivery of Destinee, the medical review panel decision, and the depositions of Dr. Cameron and Dr. Kastl.
Given Dr. Gonzalez’s education, training, and experience, the trial court abused its discretion in finding that Dr. *413 Gonzalez was not qualified to testify about 113the standard of care applicable to Dr. Butler’s use of forceps in the delivery of Destinee and whether that standard of care was breached. We further find that the trial court abused its discretion in finding that Dr. Gonzalez was not qualified to testify as to whether the improper use of the forceps caused the retrobulbar hemorrhage. Dr. Gonzalez confirmed his experience and expertise in the nature of injuries caused by the improper use of forceps in the following testimony:
Q. In your experience as an OB/GYN, what are physical signs and symptoms of a forceps injury?
[[Image here]]
A. Injury — lacerations, bruising, skull fractures, hemorrhages, intercranial hemorrhages, lacerations of the ear, injury to the eye, hemorrhage into the eye. Those are all — those are some of the complications that I have seen from forceps.
Q. For all the complications that you just listed, which, if any, were present in this case?
A. The retrobulbar hemorrhage.
Q. And none of the other signs or symptoms that the forceps were—
A. There was swelling, which goes along with it, and retrobulbar hemorrhage. Yes, that’s it.
[[Image here]]
Q. As an OB/GYN, you’re not qualified to render an opinion as to an ophthalmo-logical cause of her injury?
A. No.
Q. Would you defer to ophthalmologists with regard to their opinion as the cause of the eye injury?
A. If they found something in the eye, then the answer is yes. But I’m not going to defer to them as to forceps injuries. That’s my specialty.
Q. Your specialty is treatment of eye injuries from forceps?
A. No, my specialty is knowing how to apply and deliver babies by forceps, and I’m very familiar with what the injuries are. So to have an ophthalmologist tell me that an injury to the eye was caused — unless he finds another reason, all of a sudden he tells me — if he tells me there’s something else, fine. But what’s the something else?
[[Image here]]
Q. If those physicians who did treat Destinee Jones did not find the typical signs and symptoms of a forceps injury, and determined that it was not a forceps injury, you would have to defer to their opinion, is that correct?
A. I would have to look at what they’re saying and see if it makes any sense to me. Okay? Because to sit here and, somehow or other, say that swelling over the eye and a retrobulbar hemorrhage is not consistent with a misapplication of forceps just doesn’t make any sense tome ..., To say this injury came flying out of the night from nowhere doesn’t make any sense to me. Give me a reason.
When further pressed about his opinion as to causation, Dr. Gonzales replied:
A. You had the forceps. You had an injury to the eye. That’s a recognized complication of forceps. And I have found no other explanation for this child’s injury....
Based upon his testimony, Dr. Gonzalez has the necessary training, education, and experience to render an opinion concerning whether the improper use of forceps caused the retrobulbar hemorrhage suffered by Destinee. The trial court abused *414 its discretion in finding that Dr. Gonzalez was not qualified to testify in that regard.
The defendants also contend that the basis of Dr. Gonzalez’s causation opinion is not sufficiently reliable to satisfy the Daubert requirements. This argument involves the second of the Cheairs requirements for expert testimony, which requires that the methodology by which the expert reaches his conclusions must be sufficiently reliable as determined by the sort of inquiry mandated in Daubert. The Supreme Court in Daubert enumerated illustrative considerations to determine whether the reasoning and methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, as follows: (1) whether the expert’s theory or technique can be and has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) |1Bwhether there is a known or potential rate of error, and (4) whether the methodology is generally accepted in the scientific community. See Daubert, 509 U.S. at 593-594, 113 S.Ct. at 2796-2797; Devall v. Baton Rouge Fire Dept., 07-0156 (La.App. 1 Cir. 11/2/07), 979 So.2d 500, 502-503.
Daubert’s general “gatekeep-ing” obligation applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge. Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999). However, the test of reliability is flexible, and Daubert’s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Kumho Tire Company, Ltd., 526 U.S. at 141, 119 S.Ct. at 1171; Independent Fire Insurance Company v. Sunbeam Corporation, 99-2181 (La.2/29/00), 755 So.2d 226, 234. In determining whether particular expert testimony is reliable, the trial court should consider the specific Daubert factors where they are reasonable measures of reliability. Kumho Tire Company, Ltd., 526 U.S. at 138, 119 S.Ct. at 1170. The objective of Daubert’s gatekeeping requirement is to ensure the reliability and relevancy of expert testimony by making certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes an expert’s practice in the relevant field. See Kumho Tire Company, Ltd., 526 U.S. at 152, 119 S.Ct. at 1176.
In forming his opinion, Dr. Gonzalez reviewed the medical records associated with Jones’ labor and delivery, the depositions of Dr. Cameron and Dr. Kastl, the opinion of the medical review panel, and several articles appearing in medical journals. Based upon his review of that information and his years of training, education, and experience in the use of forceps in a delivery, Dr. Gonzalez opined that the retrobulbar hemorrhage was caused by a misapplication of the forceps. Dr. Gonzalez explained that the retrobulbar hemorrhage is Inconsistent with the type of injures that he has seen result from the use of forceps, and that his opinion was further supported by the swelling identified over Destinee’s eye. Drawing on his years of training, education, and experience in the use of forceps, Dr. Gonzalez arrived at his opinion by familiarizing himself with the facts of the subject delivery and applying his personal knowledge of complications associated with the use forceps. We find nothing inherently unreliable in this methodology. To the contrary, it is typical of the evaluation process generally undertaken by a medical expert in formulating an opinion. See Robertson, 77 So.3d at 355-357 (trial court erred in striking affidavit of medical expert whose statements were *415 based on his knowledge, experience, and training, and his review of patient’s medical records, expert reports, medical studies and literature, and depositions of the patient and his family). Accordingly, the trial court abused its discretion in finding that Dr. Gonzalez’s methodology was not sufficiently reliable under Daubert.
3. Dr. Peter Kastl
Dr. Kastl was tendered by the plaintiff as an expert in the field of ophthalmological medicine. He graduated from Tulane Medical School and completed a residency in ophthalmology, followed by a fellowship in cornea and external eye disease. He became board certified in ophthalmology in 1981 and has since been affiliated with Tulane University as a faculty member, where he is a full professor of ophthalmology. He was also the chief of ophthalmology at the Veterans Administration Hospital in New Orleans. He has previously been accepted by Louisiana courts as an expert in the field of ophthalmology and has never been rejected as unqualified. Although Dr. Kastl has not treated a child who was suspected of having sustained a birth trauma, he has treated patients with orbital hemorrhages. Based upon his review of the medical records, he believed l17that Destinee’s retrobulbar hemorrhage was caused by either the forceps or the process of labor.
The trial court found that Dr. Kastl “stated in testimony [that he] could not render an opinion on [Destinee’s] ophthalmology issue.” We find no factual support for this conclusion in the record. Dr. Kastl’s education, training, and experience qualified him to render opinions within his specialty of ophthalmology, and he did not deny his qualification to testify as to Destinee’s injury. The trial court further found that Dr. Kastl could not assist the trier of fact because he “speculated to different things” that could have caused the retrobulbar hemorrhage, which the trial court believed would “confuse the jury rather [than] assist them.” We likewise find this conclusion to be an abuse of discretion. Dr. Kastl’s testimony confirmed that the injury could have been caused by the forceps, and he explained the mechanism of the injury with a demonstration using exemplar forceps and a doll. That testimony corroborates Dr. Gonzalez’s opinion that Destinee’s injury was caused by the misuse of the forceps and supports Dr. Gonzalez’s statement that retrobulbar hemorrhage is a recognized complication of the use of forceps in a delivery. The record does not support a finding that Dr. Kastl was not qualified to render his opinion, that his opinions will confuse the jury, or that his testimony should otherwise be excluded because it “does not carry the burden of proof’ as argued by Dr. Black.
We also find no merit to Dr. Black’s contention that Dr. Kastl’s opinions should be excluded because he presented “no peer-reviewed medical literature or studies” to support his opinion that the forceps were even a possible cause of the retrobulbar injury, Dr. Kastl’s opinion was based upon his review of the medical records and his years of training, education, and experience in ophthalmology. As previously addressed, Dr. Kastl specifically described how the injury could result from trauma caused by forceps. He further noted that the bloody discharge under |18Pestinee’s eyelid was consistent with that opinion, and that the surface abrasions and lacerations around her eye were caused by the forceps. His opinion was further supported by Dr. Gonzalez’s testimony that retrobulbar hemorrhage is a recognized complication of forceps-aided deliveries. The record does not reflect anything inherently unreliable about Dr. Kastl’s review of the medical records and *416 his reliance upon his education, training, and experience to develop an opinion as to possible causes of Destinee’s retrobulbar hemorrhage, a condition that falls within his area of medical expertise. Although the defendants complain that Dr. Kastl’s presented “no peer-reviewed medical literature or studies to support his opinion that the forceps” were a possible cause of the injury, they did not introduce any medical literature establishing that the misuse of forceps could not be a possible cause of a retrobulbar hemorrhage. See Robertson, 77 So.3d at 358-359 (noting an absence of evidence that the medical expert’s opinions on medical causation were unreliable). Accordingly, we find the trial court abused its discretion in excluding Dr. Kastl as a witness and prohibiting his testimony.
Based upon the foregoing, we affirm the trial court’s judgment granting the motion in limine only to the extent the judgment precluded testimony from Dr. Cameron as to the cause of the retrobulbar hemorrhage. We reverse the granting of the motion in limine in all other respects and specifically find that Dr. Cameron and Dr. Gonzalez are qualified to render opinions concerning the standard of care applicable to Dr. Black and whether that standard of care was breached during the delivery of Destinee. We additionally find that Dr. Gonzalez and Dr. Kastl are qualified to render opinions concerning whether Dr. Black’s use of the forceps caused the retro-bulbar hemorrhage and further find that the methodology utilized [,sby those witnesses in forming their opinions is sufficiently reliable to satisfy the Daubert standard.[2]
C. Summary Judgment
After the trial court granted the motion in limine precluding any testimony from Drs. Gonzalez, Kastl, and Cameron, the defendants re-urged their motion for summary judgment. The motion was supported by several exhibits, including the opinion of the medical review panel and the trial court’s ruling granting the motion in limine. Jones opposed the motion with the depositions of Dr. Gonzalez, Dr. Cameron, and Dr. Kastl, and affidavits from Dr. Gonzalez, and a more recently retained expert, Dr. Henry O’Halloran, a board-certified ophthalmologist specializing in pediatric and neuro-ophthalmology. The defendants objected to the affidavit of Dr. O’Halloran and asked that it be struck because it was not submitted before the court-imposed deadline for plaintiffs com *417 pletion of discovery. The trial court granted the motion to strike Dr. O’Hallo-ran’s affidavit and the re-urged motion for summary judgment and entered a judgment dismissing the plaintiffs claims against Dr. Black and LAMMICO.[3]
| 2qA motion for summary judgment shall be granted only if “the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La Code Civ Pro. art. 966B(2). The party seeking summary judgment has the burden of proving an absence of a genuine issue of material fact. La.Code Civ. Pro. art. 966C. If the movant satisfies the initial burden, the burden shifts to the party opposing summary judgment to present factual support sufficient to show he will be able to satisfy the evidentiary burden at trial. La.Code Civ. Pro. art. 966C(2); Suire v. Lafayette City-Parish Consolidated Government, 04-1459 (La.4/12/05), 907 So.2d 37, 56. In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate. Sanders v. Ashland Oil, Inc., 96-1751 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1035, unit denied, 97-1911 (La.10/31/97), 703 So.2d 29.
In a medical malpractice action against a physician, the plaintiff must prove the following: (1) the standard of care applicable to the physician, (2) a violation of that standard of care by the physician, and (3) a causal connection between the physician’s alleged negligence and the claimed injuries. See La. R.S. 9:2794; Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228, 1233; Vanner v. Lakewood Quarters Retirement Community, 12-1828 (La.App. 1 Cir. 6/7/13), 120 So.3d 752, 755. Where the defendant physician practices in a particular specialty and the alleged acts of medical negligence raise issues peculiar to the particular |21medical specialty involved, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within that specialty. La. R.S. 9:2794A(1); Vanner, 120 So.3d at 754-756.
Based upon our ruling allowing Jones to present the expert opinions of Dr. Rodriguez, Dr. Kastl, and, in part, Dr. Cameron, the evidence submitted in opposition to the motion for summary judgment was sufficient to show that Jones will be able to satisfy her evidentiary burden at trial. The affidavit and deposition of Dr. Rodriguez and the deposition of Dr. Cameron satisfy the first two elements of the plaintiffs burden of proof by setting forth proof of the applicable standard of care and Dr. Black’s breach of that standard of care in the delivery of Destinee. The third requirement, a causal connection between the physician’s alleged negligence and the *418 claimed injuries, is satisfied by the affidavit and deposition of Dr. Rodriguez and the deposition testimony of Dr. Kastl.
Our conclusions with respect to the competency and sufficiency of Jones’ evidence, including the expert testimony of Dr. Cameron and Dr. Kastl, are wholly consistent with the supreme court’s previous decision to remand the case for a new trial, rather than decide it on de novo review, because “the weight of the evidence is so nearly equal.” Jones, 676 So.2d at 1067. The supreme court made that determination after reviewing much of the same evidence that is before this court on the motion for summary judgment, Given the evidence presented, we see no basis for dismissing Jones’ claims by summary judgment. Accordingly, the trial court erred in granting summary judgment to Dr. Black and LAMMICO.
CONCLUSION
We reverse the January 28, 2013 judgment of the trial court granting the defendants’ exception of res judicata and precluding the plaintiffs from presenting any argument, testimony, or other evidence on the issue of informed consent at the trial of this matter. We affirm, in part, the April 2, 2013 judgment granting the ^motion in limine to the extent the judgment precluded Jones from presenting testimony from Dr. William, Cameron as to the cause of Destinee’s retrobulbar hemorrhage; however, in all other respects the April 2, 2013 judgment is reversed, and the motion in limine is denied. Finally, we reverse the August 21, 2013 judgment to the extent it granted summary judgment to the defendants, and we remand for further proceedings in accordance herewith All costs of this appeal are assessed to Dr. William G. Black and Louisiana Medical Mutual Insurance Company.
JANUARY 28, 2013 JUDGMENT REVERSED; APRIL 2, 2013 JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; AUGUST 21, 2013 SUMMARY JUDGMENT REVERSED; MATTER REMANDED.

. See Daubert v. Merrell Dow Pharmaceuticals, Inc.. 509 U.S. 579. 113 S.Ct. 2786. 125 L.Ed.2d 469 (1993).

. Jones contends that the motion in limine should have been denied in all respects because it was "flagrantly untimely" under Louisiana Code of Civil Procedure article 1425F, which requires that the motion be filed "not later than sixty days prior to trial.” Although Jones did not assign this as error, counsel did include this assertion in the "Issues Presented for Review” in his appellate brief, To the extent this issue was properly preserved for review on appeal, we find no merit in Jones’ argument. The record reflects that the motion in limine was filed on January 2, 2013, and that the trial was scheduled on January 28, 2013. However, the trial date was set at a status conference held on December 3, 2012, which was less than 60 days prior to trial. The scheduling order further provided that all motions and exceptions had to be filed on or before January 2, 2013, Jones did not object to that deadline, and the defendants filed their motion in compliance with the deadline. Thereafter, the trial court continued the trial to August 5, 2013, and heard the motion in limine on March 25, 2013. Under these circumstances, the trial court did not abuse its discretion in continuing the trial date and considering the merits of the motion in li-mine. See Hulbert v. National Democratic Committee, 10-0772, p. 6 (La.App. 1 Cir. 5/6/13), 2013 WL 1896945 (recognizing that a continuance rests within the sound discretion of the trial court); La.Code Civ. Pro. art. 1425F(6) ("[B]y unanimous consent of the parties, and with approval by the court, a motion under this Paragraph may be filed, heard, and ruled upon by the court at any time prior to trial.”) '

. Jones did not appeal or assign any error to the trial court’s granting of the motion to strike the affidavit of Dr. O’Halloran because it was untimely, so any potential issues or errors related to that ruling are abandoned. See Uniform Rules — Courts of Appeal, Rules 1-3 and 2-12.4; Franklin v„ AIG Casualty Company, 13-0069 (La.App. 1 Cir. 6/7/13), 2013 WL 3475773 (unpublished opinion). Given the trial court’s broad discretion to enter and enforce pre-trial orders to control the course of the proceeding, including the identification of witnesses, we further find that the interests of justice do not clearly require review of the trial court's ruling. See La.Code Civ. Pro. art. 1551 A(8) and B; Southern Casing of Louisiana, Inc. v. Houma Avionics, Inc., 00-1930 (La.App. 1 Cir. 9/28/01), 809 So.2d 1040, 1055; Uniform Rules — Courts of Appeal, Rules 1-3; Franklin, at *2, n. 3.