GUIDRY, J.
|2In this dispute concerning the scope of work and payment of delay damages on a public highway project, the Louisiana Department of Transportation and Development (DOTD) appeals an adverse judgment holding it liable for additional compensation.
FACTS AND PROCEDURAL HISTORY
This dispute arises out of a public works contract executed on February 6, 2007, by the defendant public entity, the DOTD, and the plaintiff contractor, Gilchrist Construction Company, LLC, for the performance of work necessary to widen Interstate 10 east of Lake Charles, Louisiana, in accordance with plans and specifications provided by the DOTD. Gilchrist completed the project1 ahead of time and was paid the contract price, plus additional compensation for change orders and an early completion bonus, for a total payment of $76,558,550.55.
Nonetheless, on September 10, 2009, Gilchrist filed suit seeking to recover additional “construction delay costs” in the *1049amount of $5,230,672.00,2 which Gilchrist alleged were incurred due to the DOTD’s gross miscalculation of the quantity of embankment required to perform the project properly. Gilchrist alleged that but for the gross miscalculation by the DOTD, it would have bid 180 more days to complete the project. Additionally, Gilchrist alleged that “acts or omissions” by the DOTD caused Gilchrist increased costs, “including daily project overhead, acceleration costs, freight costs, home office overhead and bond costs.” On October -2, 2009, the DOTD answered the suit, denying Gilchrist’s allegations and asserting as affirmative defenses: (1) that the issues had been compromised by |3the parties during the project by plan changes or amendments to the contract; and (2) that any indebtedness to Gilchrist by the DOTD had been extinguished. Thereafter, on July 5, 2012, the DOTD filed a motion for leave to file a supplemental answer that included a request for a jury trial. In that motion, the DOTD alleged that through discovery, it had obtained information that it did not have at the time of filing its original answer, based upon which it sought to assert additional exceptions and defenses to Gilchrist’s petition. The DOTD asserted that discovery provided a better understanding of Gilchrist’s claims, as well as revealed Gilchrist’s own negligent mismanagement of the project, resulting in extensive construction delays for which Gilchrist, and not the DOTD, was liable. In a memorandum in support of the motion for leave to file a supplemental answer, the DOTD asserted the matter had not yet been set for trial and that the parties were preparing the pre-trial order, so Gilchrist would not be prejudiced by allowing the supplemental answer.
As to the new defenses, the DOTD claimed to have discovered, during Gilchrist’s deposition, that there were allegations of negligence being levied against the DOTD to which the DOTD sought to assert that it owed no legal duty to warrant the estimates of embankment quantities, and in the alternative, to the extent that the DOTD would be found negligent, that Gilchrist was comparatively negligent. Additionally, the DOTD asserted that during Gilchrist’s deposition, it was revealed that Gilchrist was seeking recovery of extra costs associated with the alleged increase in embankment work, to which it sought to assert the affirmative defense of extinguishment of debt. Following a hearing on the motion, the trial court denied the DOTD’s motion for leave to file a supplemental answer, and this court denied the DOTD’s writ application seeking supervisory review of that ruling. See Gilchrist Construction Company, LLC v. Department of Transportation and Development, State of Louisiana, 12-1459 (La.App. 1st Cir. 12/17/12) |4(unpublished writ action). The DOTD then filed a motion for summary judgment seeking dismissal of Gilchrist’s suit, which was likewise denied.
Thus, the matter proceeded to a six-day bench trial on the merits. At the conclusion of the trial, the trial court instructed the parties to submit proposed findings of facts and conclusions of law, along with post-trial memoranda. Thereafter, in a judgment signed August'21, 2013, the trial court rendered judgment in favor of Gilchrist and against the DOTD for the full sum of $4,195,127.00, for the reasons articulated by Gilchrist in its proposed findings of fact and conclusions of law. The DOTD sought and was granted a suspensive appeal of the August 21, 2013 judgment.
ASSIGNMENTS OF ERROR
The DOTD appeals the August 21, 2013 judgment based on the following alleged errors:
*1050A. The trial court’s denial of [DOTD’s] motion for leave to file a supplemental answer with request for trial by jury is clear and reversible legal error.
B. The trial court’s denial of the [DOTD’s] motion for summary judgment is clear and reversible legal error.
... 3
E. The trial court’s evidentiary ruling, rejecting [DOTD’s] tender of Daryl Ivy, P.E., as an expert witness and finding that Mr. Ivy is not qualified to testify with respect to the Critical Path Method of construction scheduling, is clear and reversible legal error.
F. The trial court’s adoption of [Gilchrist’s] legal argument that [Gilchrist] is seeking recovery of damages for construction delay and, therefore, the provisions of La. R.S. 38:2216 H apply to the contractual defenses asserted by the [DOTD], is clear and reversible legal error.
G. The trial court’s adoption of [Gilchrist’s] legal argument that the [DOTD’s] estimate of the embankment material quantity is an error or deficiency in the plans and specifications for the project is clear and reversible legal error.
|aH. The trial court committed manifest error in finding that the evidence of record, consisting exclusively of so-called “impacted”' Critical Path Method Schedules based on false information and incorrect data, established, by a preponderance of the evidence, a one hundred and eighty (180) day construction delay for which [Gilchrist] was entitled to recover delay damages.
I.The trial court committed manifest error in finding that embankment work or Type C Lime Treatment Work controlled the duration of the project after June of 2007.
J. The trial court committed manifest error in finding that the extra work performed by [Gilchrist] extended the duration of the project.
K. The trial court committed manifest error by failing to find that [Gilchrist’s] mismanagement of the work, rather than the performance of the extra embankment work, extended the duration of the project.
L. The trial court’s adoption of [Gilchrist’s] claim for recovery of home office and other overhead costs, is clear and reversible legal error.
M. The trial court committed manifest error [in] finding that the evidence of record established by a preponderance that [Gilchrist] sustained any loss in connection with operation of [Gilchrist’s] asphalt plant. [Record references omitted.]
DISCUSSION
In its first assignment of error, the DOTD argues that the trial court erred in failing to grant it leave to file a supplemental answer and thereby denied it the opportunity to assert a request for a jury trial. We find no merit in this assignment of error.
A request for a jury trial must be made in a pleading filed no later than ten days after either service of the last pleading directed to any issue triable by jury or the granting of a motion to withdraw a demand for a trial by jury. La. C.C.P. art. 1738(C). Absent the filing of the supplemental answer, the time for the DOTD to have filed its request for trial by jury would have been in its answer to Gilchrist’s petition.
*1051A supplemental pleading differs from an amended pleading in that an amended pleading involves matters that occurred before the original complaint was | fifiled, which were either overlooked by the pleader or were unknown to him at the time, while a supplemental pleading covers issues or causes of action that have arisen since the filing of the original petition, which relate to the issues or actions contained in the original petition. Gaines v. Brascato, 30,340, p. 8 (La.App.2d Cir.4/8/98), 712 So.2d 552, 557-58, writ denied, 98-1272 (La.6/26/98), 719 So.2d 1059. The discretionary authority of the court to grant leave to file a supplemental answer is outlined in La. C.C.P. art. 1155, which statute provides, in pertinent part:
The court, on motion of a party, ... may permit mover to file a supplemental ... answer setting forth items of damage, causes of action or defenses which have become exigible since the date of filing the original petition or answer, and which are related to or connected with the causes of action or defenses asserted therein. [Emphasis added.]
In its motion for leave to file a supplemental answer, the DOTD vaguely claimed that it obtained information during discovery that was not available at the time it filed its original answer, but did not specifically identify the new information allegedly obtained in discovery. On appeal, the DOTD does not raise this same argument, but instead, the DOTD maintains its assertion that had it been allowed to file a supplemental answer, it would have been able to assert Gilchrist’s comparative fault as well as what it claims to be “a second completely new defense: compensation and set-off.”
At trial, the DOTD extensively argued and offered evidence to support its allegation that Gilchrist mismanaged and poorly performed the embankment and follow-up activities in the median for construction of the new travel lanes, as well as improperly submitted documentation regarding the embankment overrun, thereby delaying the issuance of a change order to account for the overrun. Thus, to the extent evidence of Gilchrist’s alleged comparative fault was presented 17at trial, the pleadings are deemed enlarged to encompass the defense of comparative fault pursuant to La. C.C.P. art. 1154.
Moreover, “compensation and set-off’ was not a wholly new defense that the DOTD sought to assert. That defense was more than adequately asserted by the DOTD in its original answer when it pled the compromise of the issues presented in Gilchrist’s petition via plan changes or amendments to the contract and compensation as extinguishment of any indebtedness. Accordingly, we find no abuse of the trial court’s discretion in denying the DOTD’s motion for leave to file a supplemental answer.
In its second assignment of error, the DOTD argues that.the trial court’s denial of its motion for summary judgment was clear and reversible error. Generally, an appeal may not be taken from the trial court’s denial of a motion for summary judgment. See La. C.C.P. art. 968. However, it may be reviewed on an appeal of a final judgment in the suit. Parish National Bank v. Wilks, 04-1439, p. 4 n. 6 (La.App. 1st Cir.8/3/05), 923 So.2d 8, 11 n. 6.
The DOTD moved for summary judgment urging that Gilchrist’s claim was simply for compensation for work performed placing the extra quantity of embankment needed to complete the project. The argument and evidence submitted by the DOTD in support of the motion did not address whether a delay was caused by the extra embankment work, but simply pointed out that Gilchrist had been compensated at the unit price provided in the contract for performance of the extra embankment work.
*1052Louisiana Revised Statute 38:2216(H) provides, in pertinent part:
Any provision contained in a public contract which purports to waive, release, or extinguish the rights of a contractor to recover cost damages, or obtain equitable adjustment, for delays in performing such contract, if such delay is caused in whole, or in part, by acts or omissions within the control of the contracting public entity or persons acting on behalf thereof, is against public policy and is void or unenforceable. [Emphasis added.]
IsThus, under the express language of La. R.S. 38:2216(H), to the extent Gilchrist established that it incurred damages due to a delay in performing the project, caused in whole or in part by the DOTD, Gilchrist is entitled to recover those damages, irrespective of any contractual provisions to the contrary. As the DOTD’s motion for summary judgment failed to address this issue, which is the cornerstone of Gilchrist’s claim, we find no error in the trial court’s denial of the DOTD’s motion for summary judgment. Additionally, as will be discussed later in this opinion, a determination of whether Gilchrist established that it incurred damages due to a delay in performing the project caused by the DOTD is, in part, a factual determination. Thus, as there remained genuine issues of material fact regarding whether delay damages were incurred, the trial court properly denied the motion for summary judgment. See La. C.C.P. art. 966(B)(2) and (C)(2). Hence, we reject this assignment of error.
Next, Gilchrist argues that the trial court erred in limiting the qualification of its expert, Darrell Ivy, to civil engineering and refusing to accept him as an expert in critical path method (“CPM”) scheduling. During the DOTD’s case-in-chief, it offered the testimony of Mr. Ivy as an expert in civil engineering and CPM scheduling. Gilchrist objected to the tender of Mr. Ivy as an expert in civil engineering, stating that the pre-trial order only disclosed Mr. Ivy as being an expert in CPM scheduling.4 The trial court deferred ruling on Gilchrist’s objection to the tender of Mr. Ivy until the completion of the voir dire on Mr. Ivy’s expert qualifications. After the completion of Mr. Ivy’s voir dire, the trial court accepted Mr. Ivy as an expert in civil engineering, based on his curriculum vitae, but refused to accept him as an expert in CPM scheduling. The DOTD was allowed to proffer |3Mr. Ivy’s testimony as a CPM expert.
Trial courts have great discretion in determining the qualifications of experts and the effect and weight to be given to expert testimony. In the absence of a clear abuse of this discretion, this court will not disturb a trial court’s ruling on the qualification of a witness. Bradbury v. Thomas, 98-1678, p. 9 (La.App. 1st Cir.9/24/99), 757 So.2d 666, 673. Moreover, a finding of such an evidentiary error may affect the applicable standard of review, in that this court must conduct a de novo review if the trial court commits an evidentiary error that interdicts the fact finding process. Maddox v. Bailey, 13-0564, p. 5 (La.App. 1st Cir.5/19/14), 146 So.3d 590, 594.
The admission of expert testimony is governed by La. C.E. art. 702, which at the time of trial stated5:
*1053If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In Cheairs v. State ex rel. Department of Transportation and Development, 03-0680, pp. 9-10 (La.12/3/03), 861 So.2d 536, 542, the Louisiana Supreme Court adopted the following three-part inquiry for determining whether it is proper to admit expert testimony under La. C.E. art. 702: (1) if the expert is qualified to testify competently regarding the matters he intends to address; (2) if the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and (3) if the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a | mfact in issue. However, a challenge to an expert’s qualifications just falls within the first prong of the Cheairs inquiry and does not involve a Daubert analysis. Jones v. Black, 13-1889, p. 9 (La.App. 1st Cir.5/2/14), 145 So.3d 402, 411, writ denied, 14-1116 (La.9/19/14), 148 So.3d 954.
In his voir dire, Mr. Ivy testified that he works as a construction engineer for SJB Group of Baton Rouge, Louisiana, providing consulting services for the DOTD. He said eighty-five percent of the work he does for the DOTD involves reviewing, analyzing and working with CPM schedules. At the time of trial, he testified that he had been employed with the SJB Group for about ten years.
Mr. Ivy holds a bachelor’s degree in civil engineering from Texas A & M, which degree he received in 1982, and a master’s degree in civil engineering from Stanford University, which degree he received in 1989. He also testified that he has been licensed as a civil engineer since 1984. In regards to his CPM scheduling experience, Mr. Ivy testified that he took courses in CPM scheduling at Texas A & M and that he was “privileged to learn under Professor Fondahl at Stanford, [who] was very instrumental in the development of the CPM tool.” He testified that he prepared his first CPM schedule by hand in 1984, which calculations and plotting are now largely done by computer using software programs such as Primavera. Mr. Ivy stated that he has been using Primavera, in various versions, since 1987. '
Mr. Ivy testified that over ninety percent of his consulting services with the SJB Group were provided to the DOTD and that a majority of that work had been “in support of the DOTD CPM specifications.” In his curriculum- vitae, Mr. Ivy indicated that his job duties with the SJB Group included preparing and reviewing construction CPM schedules for the DOTD, public works and financial institutions. His curriculum vitae also states that from 1982 to 1998, while employed for T.L. James & Company, Inc., his job duties included CPM ^scheduling and analysis for production operations, change orders and claims and project CPM and production scheduling.
The trial court was impressed with Mr. Ivy’s credentials only as a civil engineer, based on Mr. Ivy’s curriculum vitae and voir dire, and thus, it only qualified him as an expert in civil engineering. Pursuant to this limitation of his qualification, the trial court sustained objections to Mr. Ivy presenting any opinion testimony regarding CPM scheduling. In particular, the trial court observed that “there’s been no meaningful demonstration with respect [to Mr. Ivy’s expertise in CPM scheduling]. *1054Where did he get his credentials in CPM? ... What’s he published? ... there was a paucity of information in that regard.”
Experience alone is normally sufficient to qualify a witness as an expert. The fact that a witness does not' have a college degree does not disqualify him from testifying as an expert, if the witness has sufficient experience. Cheairs, 03-0680 at p. 8, 861 So.2d at 542. The weight to be given to the testimony of experts is largely dependent upon the facts upon which their opinions are based. Commonwealth Insurance Company v. Halliburton Energy Services, Inc., 03-2490, pp. 8-9 (La.App. 1st Cir.12/30/04), 899 So.2d 24, 30, writ denied, 05-0300 (La.5/6/05), 901 So.2d 1095. As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. Jones, 13-1889 at p. 9,145 So.3d at 410.
In light of Mr. Ivy’s education and experience, we find that the trial court abused its discretion in failing to accept Mr. Ivy as an expert in CPM scheduling and not allowing him to offer his opinion regarding the use of CPM scheduling in this matter. Although Mr. Ivy’s curriculum vitae does not provide a detailed description of his CPM scheduling experience, it does document that he in fact started garnering such experience as early as 1982, a period of more than 30 years, |12in the course of his work as a civil engineer in the construction field. Further, Mr. Ivy explained at trial that he took classes in CPM scheduling at both Texas A & M and Stanford University. While the trial court may not have been overly impressed with the way Mr. Ivy presented his experience, there is nothing in the record before us that discredits his testimony or curriculum vitae regarding that experience. Hence, we find merit in this assignment of error and find that Mr. Ivy should have been qualified as an expert in CPM scheduling.
Hence, the trial court clearly abused its discretion in failing to allow Mr. Ivy to testify as an expert regarding CPM scheduling; however, a de novo review should not be undertaken for every evidentiary exclusion error. Instead, a preliminary de novo review limited to a determination of the impact of the excluded evidence on the overall judgment may be undertaken. Wingfield v. State, Department of Transportation and Development, 01-2668, p. 15 (La.App. 1st Cir.11/8/02), 835 So.2d 785, 799, writs denied, 03-0313, 03-0339, 03-0349 (La.5/30/03), 845 So.2d 1059, 1060, cert. denied, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003); see also Rideau v. State Farm Mutual Automobile Insurance Company, 06-0894, p. 5 (La.App. 1st Cir.8/29/07), 970 So.2d 564, 571, writ denied, 07-2228 (La.1/11/08), 972 So.2d 1168 (where this court held that de novo review should be limited to those findings tainted by application of incorrect principles of law that are prejudicial). If it is found that the error did not have a prejudicial effect on the case, the trial court’s findings are not interdicted. See Pelts & Skins Export, Ltd. v. State, Department of Wildlife and Fisheries, 97-2300, pp. 5-6 (La.App. 1st Cir.4/1/99), 735 So.2d 116, 122-123, writs denied, 99-2036, 99-2042 (La.10/29/99), 748 So.2d 1167, 1168.
Based on our limited de novo review, discussed in more detail later in this opinion, we find that the limited exclusion of Mr. Ivy’s testimony, in regards to his opinion as to why Gilchrist’s calculations using a baseline CPM schedule to | ^determine if a delay was caused by the extra quantities of embankment and lime, was not prejudicial and therefore did not interdict the trial court’s factual findings. Most of the problems with the baseline *1055CPM schedule that Mr. Ivy testified about on proffer were presented during the examination of Gilchrist’s witnesses, and in particular, DOTD’s cross examination of Gilchrist’s expert scheduling witnesses. Thus, much of Mr. Ivy’s testimony on proffer was presented during trial and considered by the trial court, making the exclusion of Mr. Ivy’s proffered testimony, at most, harmless. See Pelts & Skins Export, Ltd., 97-2800 at p. 6, 735 So.2d at 122-28.
We will now consider the evidence and arguments raised in the remaining assignments, which all address the primary issue raised in this appeal — whether Gilchrist properly proved that it incurred delay damages because of the increased quantities of embankment and lime used for the project.6
A cost-plus-time bidding procedure was used to bid and award the subject project. That procedure takes into account not only the contract amount bid, but also the contract time bid for completion of the project to final acceptance. In order to bid a contract amount, each bidder had to bid a pay item unit price for each item of work contained in the Schedule of Items of the construction proposal. The Schedule of Items in the construction proposal contained 143 pay items for work that needed to be performed on the project. Thus, the contract amount bid was the summation of the products of the quantities shown in the Schedule of Items multiplied by the pay item unit bid prices.
|HFour companies submitted bids for the project. According to the bid tabulation, Gilchrist’s bid was both the lowest in price ($385,103.45 lower than the next lowest cost bid) and the lowest in proposed completion time (106 days less than next lowest completion time bid). Among the various pay items listed in the Schedule of Items was pay item 203-04 for embankment. Although Gilchrist submitted the lowest overall bid for the project, its unit price for the embankment pay item was actually the highest, being $25.00 per cubic yard as compared to the other three bids of $12.00, $9.50, and $15.00 per cubic yard, respectively. However, witnesses for Gilchrist and the DOTD testified that it is not unusual for a contractor to overbid one item, making the bid on that item “unbalanced.” However, in such cases, the contractor must underbid another item to remain competitive. ' Such an underbid would mean that the contractor’s bid price for that item was at or below the cost the contractor calculated to perform the work on that item.7
The record before us establishes the following facts: (1) Gilchrist placed over sixty thousand cubic yards of additional embankment material (a forty percent increase) than what was advertised in the public bid; (2) Gilchrist accomplished placing the additional embankment material *1056and all of the other items of work required to complete the project in less time than what was bid or that the contract required (Gilchrist’s winning bid and the original contract required the work to be completed in 800 days; however, because of adverse weather days and the issuance of various change orders, the completion time for the contract was ultimately extended to 899 days. Gilchrist completed the project in 769 days); (3) DOTD |1fipaid Gilchrist the contract price of $25.00 per cubic yard for placing the additional embankment material; and (4) Gilchrist was also paid the maximum amount possible as an early completion bonus (the contract specified that the DOTD would pay Gilchrist the daily road user cost of $15,000 per calendar day for each day of early completion up to a maximum of $1,710,000,00, which equates to payment for up to 114 days).
The DOTD argues that under the terms of the contract, Gilchrist was fully and completely compensated for any additional work caused by the increased quantities of embankment and lime. Gilchrist, however, argues that it incurred damages due to the “delay” in the project caused by placement of the extra embankment and lime treatment, despite being compensated at the contractual price for the extra quantities and further being paid a bonus for early completion of the project. Critical to determining if Gilchrist is entitled to .compensation in excess of that provided under the terms of the contract is a determination of whether Gilchrist sufficiently proved that the addition of the increased quantities of embankment and lime actually delayed the project.
180 DAYS
As proof that a delay of the project occurred due to the forty percent increase in embankment and thirty percent increase in lime, Gilchrist used its initial, baseline CPM schedule8 (referred to as the “10BL”) to show that the placement of the extra embankment and lime delayed the project by 180 days. The DOTD, on the other hand, argues that the way in which Gilchrist used the 10BL to calculate whether the project was delayed was improper and incorrect.
11fiThe contract9 for the project contained a special provision titled “CRITICAL PATH METHOD (CPM) FOR CONSTRUCTION PROGRESS SCHEDULING.” According to this special provision, “construction scheduling, establishing the critical items of work, and measuring progress of the work” were to be performed using “Critical Path Methods (CPM) as described and with terms as defined in the Associated General Contractors of America (AGC) publication, Construction Planning and Scheduling, latest edition.” The special provision further provided that “[i]n case of discrepancy between these specifications and- Construction Planning and Scheduling, these specifications shall govern.” (Emphasis added.)
As outlined in the CPM special provision, Gilchrist was required to submit CPM Construction Schedules, Summary of *1057Activities tabulations, and Scheduled Earnings tabulations, collectively referred to as the “Construction Progress Schedule” or “Construction Schedule,” to the DOTD project engineer for approval. All approved Construction Progress Schedules and approved associated data became a part of the contract documents. The construction schedule was required to show and describe the various activities of work required to complete the contract in sufficient detail so that all activities were readily identifiable and progress on the activities could be readily measured. The construction schedule was also required to show the sequence in which the activities were to be accomplished and their dependency relationships.
The CPM special provision also modified Subsection 108.07 of the standard specifications,10 titled “DETERMINATION AND EXTENSION OF CONTRACT |17TIME,” to provide:
If satisfactory fulfillment of the contract requires performance of work in greater quantities than those specified ... and the contractor requests additional contract time, the contractor shall submit a proposed CPM schedule based on the latest approved CPM schedule showing the increased time and revised completion date for approval by the [DOTD]. ... A CPM schedule will be required for the engineer to process a change order that ... increases ... the contract time.
As described by David Gilchrist, president and CEO of the company, the project was located along a rural section of Inter-' state 10 from Highway 165 south, going into Lake Charles, to the 210 Loop. The project involved widening Interstate 10 along that approximately ten-mile stretch by filling in the median between the existing lanes of travel to create two new lanes of travel, one in each direction. The project also involved widening some bridges and rubberizing the existing travel lanes.
Gilchrist first notified the DOTD that there appeared to be a shortage in the amount of embankment that had been estimated for the project by a letter dated July 9, 2007, from Gilchrist’s project engineer, J.J. Hickey, to the DOTD district project engineer Todd Landry. In the letter, Mr. Hickey notified the DOTD that Gilchrist had performed field cross sections 11 of the median and shoulders in April 2007, to measure embankment quantities. The cross sections revealed that an additional 56,65812 cubic yards of embankment material were needed. The letter *105811 ¡¡indicated that the calculations Gilchrist used to determine the embankment overrun were attached. Mr. Hickey concluded the letter by stating that Gilchrist “kindly requests that DOTD respond in a timely manner so that [Gilchrist] may review the contract schedule and make any necessary adjustments as soon as possible.”
Mr. Landry responded by email on July 16, 2007, to state that “[i]n order for our office to check and agree with these numbers, we’ll need to see the data which shows the shots for the original x-see-tions.” He further noted that he had some questions regarding how the fill (embankment) quantities were calculated. In a later email dated September 25, 2007, Mr. Landry outlined how Gilchrist’s calculations and cross sections needed to be submitted.13 Gilchrist succeeded in submitting cross sections that were satisfactory to the DOTD in March 2008; however, the embankment work in the median was mostly complete by November 2007. A change order incorporating the additional embankment quantities was issued by the DOTD on August 8, 2008.
On February 6, 2009, Gilchrist submitted an updated claim for additional time and compensation relative to overruns in embankment and lime. In the updated claim, it noted that Gilchrist had previously “submitted, separately, claims on the Embankment and Lime Treatment quantity overruns.” Attached to the updated claim were three “impacted” CPM schedules that Gilchrist produced by modifying the 10BL to add the extra quantities of embankment and lime used for the project. The • impacted schedules were labeled 10EM (calculated based on the extra embankment quantity only), 10LT (calculated based on the extra lime quantities only), and 10EL (calculated based on both the extra embankment and extra lime quantities). At trial, Gilchrist introduced the schedules as evidence of its delay damages claim.
| yjmpacted Schedules v. PE25
Michael Myers, a Gilchrist expert witness accepted in the fields of construction project scheduling and delay analysis, and Dr. Jerry Householder, a Gilchrist expert witness accepted in the fields of construction contract administration, management, and scheduling, both opined that the impacted schedules were an appropriate assessment of any impact the increased quantities had on the progress of the project. They emphasized, how the analysis provided in the impacted schedules complied with contractual specifications for evaluating time extensions.
In his proffer, Mr. Ivy acknowledged that the contract provides that if an unexpected event is identified, and it is expected to cause a time impact or result in a time-extension request, then the CPM schedule was to be updated to that point to include or incorporate the changed work. He stated the schedule should then be submitted to commence discussions as to whether a time extension would be appropriate or not. He explained that such an update of the schedule would occur in a “forward-priced situation where you’re trying to come to an agreement in advance ... of the impacted work.” He identified this method, as outlined in the contract, as the “best practice.”
When Gilchrist first recognized the potential overrun in embankment, it asked the DOTD to acknowledge the overrun, so it could make necessary adjustments to the schedule as soon as possible. Gilchrist *1059asserts that this was its request for the granting of a time extension. Based on change order 19, it is apparent that the DOTD acknowledged the overrun; but simply refused to issue a change order for the full quantity of the overrun without the appropriate documentation first being supplied. Mr. Ivy testified that the CPM schedule could have been updated to incorporate the extra quantities, even without a change order, and would likely have been approved. Yet, Jesse Guillory, Gilchrist’s project | zpscheduler who generated the 10BL and the subsequent updates of the CPM schedule, testified to the contrary. He stated that he could not update the CPM schedule with the extra quantities until a change order had been issued.
Because the CPM schedule was not updated in advance of the extra quantities being incorporated into the work, on proffer, Mr. Ivy rejected the retroactive calculation of a time impact using the 10BL, stating that “[a] schedule is predominantly a projection. It’s used to measure progress. It’s used to determine the completion date ... and also used to document what’s occurred on the project.” He said “that the best use of a schedule would be in a forward-looking sense, and you use the facts after the event.” Hence, he opined that “[i]f you have the facts, use the facts. There’s no need to go back to a projection, especially this particular one [i.e., the 10BL].” Thus, he testified that under the circumstances, it was best to simply look at the facts as they actually occurred, and the best and most proper evidence of those facts, under the circumstances, was the schedule PE25, which was the culmination of all the updated CPM schedules prepared by Gilchrist as the work progressed. The PE25 displayed all the work that had actually occurred on the project. Mr. Ivy testified that a review of the PE25 revealed that no delay was caused by the extra quantities of embankment and lime added to the project.
Consequently, Mr. Ivy opined that the “three impacted schedules [were] improper, erroneous, and, if not, misleading.” He explained that the calculations of delay made in the impacted schedules were improper,- because the only adjustment made to the 10BL was to add the extra quantities. No adjustments were made to the 10BL to correct errors that were discovered and corrected in updated versions of the schedule that were later issued. He also opined that the 10BL was improperly used to calculate a delay because no adjustment was made to the |⅞1 schedule to reflect the production rate14 and construction sequence actually used in performing the work.
The only evidence of the 180-day delay claimed by Gilchrist are the impacted CPM schedules Gilchrist generated based on modification of the 10BL. The 10BL did contain an error in its projected distribution of the embankment. Instead of projecting that the vast majority of the embankment would be used in the median, the 10BL had significant embankment portions allocated to the outside shoulders and to the final dressing of the roadway. Mr. Guillory, the project scheduler for Gilchrist at the time of the project, was responsible for creating the 10BL and updating the schedule once every 30 days. Mr. Guillory testified that in creating the 10BL, he made an “educated guess” as to how to distribute the original 160,510 cubic yards of embankment, because the project plans that had' been provided by the DOTD did not provide any cross sections or an embankment breakdown. The error in the *1060distribution of embankment quantities was corrected with the issuance of the third updated CPM schedule, the PE3.
The 10BL also does not accurately reflect how the work was actually performed on the project. The 10BL contained a planned embankment production rate of 409 cubic yards per day, whereas the actual production rate obtained on the project was roughly 1100 cubic yards per day.
In regards to the increased production rate, both Mr. Gilchrist and Mr. Guillory testified that it had always been the company’s intent to finish the project early. Furthermore, in reviewing the estimate paperwork from which Gilchrist calculated its bid for the project, on proffer, Mr. Ivy found that the production rate calculated for purposes of placing Gilchrist’s bid and the actual production rate that occurred in performing the work were quite close and both greatly exceeded |22the production rate projected in the 10BL. Mr. Hickey, however, testified that Gilchrist performed the embankment work at the accelerated production, rate because of the DOTD’s refusal to grant any extra time for the additional quantities of embankment. As he explained, Gilchrist was compelled to increase its production rate and work inefficiently to avoid the threat of liquidated damages in the event the extra quantities caused it to fall behind schedule in completing the project.
The 10BL also retained the original planned construction sequence for the work to be performed in separate phases, rather than the actual construction sequence used that resulted in the embankment work in the median being performed in just one phase. As early as June 2007, Gilchrist recognized that a safety issue was presented by the planned sequencing of construction for the project. In a letter dated June 28, 2007, Mr. Hickey advised Mr. Landry, DOTD’s district project engineer that:
Our crews have recently repaired numerous failures on the existing outside asphalt shoulder. The failures have occurred in areas where the traffic has been shifted and temporary barriers rails have been placed as called for in the plans. The failures are of great concern to our project team as they create very hazardous conditions'for the traveling public.
Mr. Hickey went on to relate how the additional lane shifting and reduction called for in the existing plans would increase the traffic loading on the already deteriorating shoulders, which, in turn, could pose an “extreme hazard” to vehicles. In concluding the letter, Mr. Hickey asked that the DOTD “analyze the situation .to determine if there is an alternate design or sequencing that would create less hazardous conditions for the traveling public.”
In a letter dated November 29, 2007, Mr. Hickey, on behalf of Gilchrist, presented a formal written proposal to change the sequencing of construction for the project. According to the letter:
| ?jjThe original phasing called for the project to be built in three segments (phase 1A, IB and 2A) that were approximately three miles in length and a fourth segment (2B), which was a little less than a mile long. [Gilchrist] would build the new inside widening areas of phases 1A and IB, which were separated by phase 2A, switch traffic to the inside and rebuild the existing outside lanes. We would then move to phase 2A and repeat the process. It is likely that the project was planned this way, because the quantity of concrete barriers required would be much less than what would be required to build the inside lanes all the way through the project.
With the above scenario, however, the existing outside lanes in phase 2A would *1061not be re-built until the later months of the project. All parties have agreed that the existing lanes need to be rebuilt as soon as possible to reduce exposure to DOTD and [Gilchrist]. Since the beginning of the project we have watched the existing lanes deteriorate under the heavy traffic and extreme wet conditions we have experienced. [Gilchrist] and DOTD have partnered to maintain the existing road until traffic could be switched. However, this effort has resulted in increased costs to both DOTD and [Gilchrist] along with increased exposure.
[Gilchrist] and DOTD have since discovered that there are enough concrete barriers in DOTD’s possession to allow [Gilchrist] to completely close off the inside median throughout phases 1A, IB, and 2A. [Gilchrist] is proposing to use enough DOTD barriers to close the inside median of phase 2A and continue inside construction. This will allow [Gilchrist] to construct the inside lanes and shoulder throughout and move traffic from the existing lanes to the new lanes in all three phases at one time....
The DOTD assented to Gilchrist’s proposal to change the construction sequencing so that the construction in the median was performed in one phase, instead of in separate phases.
Despite these discrepancies in the 10BL, neither Gilchrist nor the DOTD presented an analysis of time impact using an updated schedule more contemporaneous with when the overruns were discovered. Mr. Myers testified that it was not appropriate to calculate any time effects on an “as-built” or updated schedule. He explained that a CPM schedule only calculates on uncompleted events, and once an event is completed, it is, practically speaking, out of calculation. He said that once a schedule reflects what actually happens, changing it has no effect. He also testified that had he been asked to conduct an analysis of l^the time impacts associated with the increase in embankment and lime quantities in June 2007, when the overruns were first discovered, he would have performed the exact same analysis, because actual information regarding the production rates or actual end dates would not have even been available to consider at that time. Dr. Householder likewise testified that had the increased quantities been acknowledged when the overrun was first discovered, the method would have been to plug in the overrun quantities into a schedule unim-pacted by acceleration and the “extra things” that went into bringing the job back on schedule, just as Gilchrist did.
On proffer, Mr. Ivy testified that he did attempt to make some calculations using the 10BL, similar to what Gilchrist did. While acknowledging that the schedule “could have been finished earlier,” he concluded such an early completion would be primarily due from “the relief of the phasing” that resulted from the change in the construction sequence. He ultimately concluded, however, that the issues regarding how the embankment was distributed, the production rates, and the construction sequencing had to be addressed in making any calculations using the 10BL and because embankment was not “critical,” the embankment overrun did not cause any days of delay. He also opined that lime treatment never caused a delay in the project.
Considering the foregoing, we find that the trial court did not err in accepting the impacted schedules as evidence of delay caused by the increased quantities of embankment and lime. Despite the discrepancies in the 10BL, we foremost recognize that the impacted schedules are more in conformity with the parties’ contractual agreement for determination of the issue of delay than simply considering the PE25 as suggested by the DOTD.
*1062Moreover, Mr. Ivy acknowledged that he had recommended that the DOTD approve the 10BL, which, despite objecting to its use for the impacted schedules, he nevertheless recognized was a good plan. As he explained, the 10BL “was a 12r,valid plan for the work. It was feasible, reasonable. It was in conformance with the contract documents. It finished on time. Passed the smell test.” He also stated that the “lOBL’s plan ... was a good plan for the consideration that the embankment and the new lane construction would proceed together in echelon. That would have been a good plan that would have minimized ... the risk and exposure of the embankment material to the weather that was suffered on the job as it progressed.”
And while there may be some logic to Mr. Ivy’s opinion to consider only the PE25, the problem with simply relying on “the facts” as shown in the PE25 is that it gives the DOTD the unbargained for advantage of reaping the benefits of Gilchrist’s efforts to increase productivity to such a rate that the extra quantities did not, in fact, retard the progress of the embankment work. Mr. Hickey and Mr. Ivy both acknowledged the embankment work was actually completed in roughly the same amount of time as originally planned. And clearly this was due, in some portion, to the increased production rate of the work as actually performed as compared to the production rate that had been initially planned in the 10BL.
Whether the increase in the production rate was a result of trying to avoid the threat of incurring liquidated damages or was simply a manifestation of Gilchrist’s ever-present intention to complete the work as soon as possible, the fact remains that Gilchrist did perform the embankment work at a pace that was far faster than the production rate that had been approved by the DOTD in the 10BL. And as Dr. Householder testified, as a matter of custom and practice in the construction industry, a contractor has a right to finish early.
We therefore find that based on the evidence presented, the trial court did not clearly err in finding that Gilchrist sufficiently proved that the project was delayed due to the increased quantities of embankment and lime used in performing the contracted work. Correspondingly, we find the record amply ^supports the trial court’s implicit finding that the increased quantities that caused the delay were caused by the acts or omissions of the DOTD.
Dr. Householder emphatically opined that the forty percent increase in the quantity of embankment was not an “approximation,” but a mistake in the plans. Furthermore, in change order 19, wherein the DOTD authorized the initial increase of 10,000 cubic yards of embankment and recognized that the original contract quantity of 160,510 cubic yards was “substantially less than what [was] required for contract completion,” the DOTD stated:
Mr. John Faulk, from DOTD District 7 Design Section, has referenced two potential reasons for this quantity overrun: 1) The method of survey, aerial photogrammetry, which was used for the contract estimate, is not as accurate as obtaining shots in the field. 2) The original project limits were increased after the project design was well underway, but another survey, for additional embankment, was not done.
Patrick Landry, the DOTD design engineer who was primarily responsible for preparing the plans for the project, acknowledged that the embankment bid quantities were determined by the DOTD and that there was an error in the quantities listed in the advertisement for bid.
Accordingly, we find no error in the trial court’s conclusion that Gilchrist is entitled *1063to recover the cost damages it incurred as a result of the delay it proved occurred in performing the contract. We will therefore review the damages awarded by the trial court to consider whether those damages were properly awarded.
DAMAGES
Job Site Overhead and Lime
Since we determined that the trial court did not err in accepting the impacted schedules as evidence of a work delay in this matter, we find no error in the award | ⅞701' the project overhead, plant overhead, and the cost of the additional lime15 purchased to process into the embankment, as those damages can be directly attributed to the calculated delay. As Michael Dai-gle, the DOTD’s CPA expert acknowledged, “[pjroject overhead is a real cost” and if the project is extended beyond what was originally anticipated, the contractor does incur real costs. In such a-case, he stated that the party responsible for the extension should be identified and that party needs to pay that job site overhead.
Idle Equipment and material stockpiling
As previously discussed, although the impacted CPM schedules, based on the 10BL, show that absent changes made in the way the work was actually performed, the performance of the contract would have been delayed 180 days, it must be equally recognized that due to the changes in the way work was performed, Gilchrist was able to complete the work within and even in advance of the window of time originally planned. Since the work, as actually performed, did not fall behind schedule, but was completed within the same windows of time as originally planned, the delay calculated in the impacted schedules cannot be said to have impacted when various work activities occurred on the project. This is especially true in regard to the embankment work, wherein Mr. Ivy and Mr. Hickey both recognized that the embankment work in the median was completed within the same time frame as was projected in the 10BL.
Therefore, it must be acknowledged that there was no actual delay in the progress of the work, due to the changes in the way the work was performed as opposed to how it was planned or scheduled for the work to be performed. | ^Nevertheless, there is evidence in the record of instances of equipment being idle and material stockpiling during construction.
The DOTD argues that the instances of idle equipment and stockpiled materials were due in large measure to Gilchrist’s mismanagement of the job. It asserts that Gilchrist failed to “button up” its work, when the construction sequence changed, and Gilchrist should have performed some of the activities following the embankment, which would have involved use of the idle equipment and stockpiled material, sooner than what Gilchrist did.
For the work in the median, as constructed, Gilchrist placed embankment for almost half of the entire ten-mile stretch of the median. Then after placing almost half of the embankment, Gilchrist began adding the subgrade. Then, once twenty-five percent of the subgrade had been poured, Gilchrist began adding the base course. When roughly forty percent of the base course had been added, Gilchrist began adding the asphalt. Consequently, use of the material and equipment necessary for adding the subgrade, base course *1064and asphalt was occurring at a later time than was originally planned, although, inversely, the embankment work was completed much sooner than originally planned.16
The change in the sequence of construction mainly involved completing the work in the median before performing the other work on the existing travel lanes. As previously explained, the project not only involved construction of two new travel lanes in the median, but also rehabilitation of the existing travel lanes as well. Mr. Ivy testified that Gilchrist negligently waited until almost half of the embankment had been placed before it began adding the subgrade material. Dr. Householder, however, testified that because the DOTD did not authorize a time extension for the extra quantities of embankment, Gilchrist worked inefficiently by | ¡^working longer hours, working under less than optimal conditions, and adding labor, equipment and resources, to incorporate the extra quantities and keep the work on schedule. Mr. Hickey further testified that a lot of resources were involved with constructing the embankment “that couldn’t be utilized on the follow-on work.”
Although the DOTD asserts that it was due to Gilchrist’s mere negligence that the follow-on activities, which would have utilized the idle equipment and stockpiled material, did not occur, Gilchrist presented evidence to conversely show-that when faced with the embankment overrun, it was forced to marshal all of its resources to address the overrun and keep the project on schedule. Whereas Mr. Ivy opined that Gilchrist waited too long to commence the follow-on activities, Gilchrist presented evidence that the follow-on activities were only postponed long enough to place the extra quantities. Considering this conflicting evidence, we cannot say that the trial court erred in awarding Gilchrist the costs related to idle equipment and stockpiled materials.
Home Office Overhead and Eichleay Formula
The DOTD contends that the trial court erred in awarding Gilchrist home office overhead that was calculated by Gilchrist using the Eichleay formula. The Eichleay formula is derived from a decision of the Armed Services Board of Contract Appeals in Appeal of Eichleay Corporation, ASBCA No. 5183, 60-2 BCA P 2688, 1960 WL 538 (A.S.B.C.A.1960).17 The DOTD argues that it is only proper to award home office overhead pursuant to the Eichleay formula if there is a complete work stoppage, i.e., a period of time when no work is performed. However, because work was continuously being performed .by Gilchrist, thejjjDOTD contends that Gilchrist is not entitled to recover costs related to home office overhead that Gilchrist claims based on the Eichleay formula.
In JMR Construction Corporation v. United States, 117 Fed.Cl. 436, 442 (2014), the federal claims court provided the following description of home office overhead and how it is typically recouped by contractors:
The term “home office overhead” refers to the general administration costs of running a business, such as accounting and payroll services, general insurance, salaries of upper-level management, heat, electricity, taxes, and depreciation. These are indirect costs, “expended for the benefit of the whole business, [and thus] by their nature cannot be attributed or charged to any particular contract.”
*1065Contractors typically recoup these indirect costs by allocating them to individual contracts in proportion to those contracts’ direct costs. [Citations omitted.]
The issue addressed in the Ei-chleay case was “how to allocate home office expenses incurred during a period of suspension of work.” As the tribunal in-that case observed, “[t]hese expenses continue during temporary or partial suspensions, [when it is] not practical for the contractor to undertake the performance of other work which might absorb them.” (Emphasis added) The formula adopted by the tribunal in that case, which is now known as the Eichleay formula, is computed as follows:
1. (Contract billings/Total billings for the contract period) x total overhead for the contract period = overhead allocable to the contract.
2. Allocable overhead/Days of performance = Daily contract overhead.
8. Daily contract overhead x Number of days delay = Amount claimed.
Appeal of Eichleay Corporation, 60-2 BCA P 2688,1960 WL 538.
Use of the Eichleay formula, however, requires contractors to satisfy several strict prerequisites.
First, the contractor must demonstrate that there was a government-caused delay not excused by a concurrent contractor-caused delay. Second, the contractor must show that it incurred additional overhead expenses, either because the contract’s performance period was extended or because the contractor would have finished prior to the un-extended performance period’s close.
| m Third, the contractor must establish that it was required to remain “on standby” for the duration of the delay.
In order to establish standby, contractors must demonstrate three things. First, the contractor must show that the government caused delay was “not only substantial but was of an indefinite duration.” Second, the contractor must demonstrate that, during the delay, it was required to return to work “at full speed and immediately.” Third, the contractor must show a suspension of most if not all of the contract work.
JMR Construction Corporation, 117 Fed. Cl. at 442-43 (emphasis added; citations omitted).
The underlying principle of the Eichleay formula, that the delay caused by the public entity precludes the contractor from undertaking other work to otherwise absorb the continuous accrual of home office overhead, could be said to be equally evident in this case. According to the impacted schedules, if all other factors were to remain constant, but the embankment and lime overruns did not exist, Gilchrist should have completed the project 180 days (if not more days considering the increased production rate) sooner and thereby would have been free to take on other work 180 days sooner. Yet, as stated previously, application of the Eichleay formula is subject to “strict prerequisites,” and there is some indication in the jurisprudence that use of the formula should not be allowed outside of the given parameters. See Nicon, Inc. v. U.S., 331 F.3d 878, 884 (Fed.Cir.2003).
In this case, there was no work stoppage, which is one of the prerequisites for application of the Eichleay formula established under the jurisprudence. And while the Eichleay formula is basically a jurisprudential doctrine emanating from the federal courts that has seeped, to a slight degree, into our state court system for adoption, we observe that even use of the formula by our courts has been Inconsistent with the prerequisites previously outlined.18 Consistently, we decline *1066to modify or extend the application of the formula by our ruling herein, and we therefore find that the trial court’s award of home office overhead should be vacated.
CONCLUSION
Therefore, having thoroughly reviewed-the voluminous record in this matter and considering the applicable law, we affirm the trial court’s judgment in favor of Gilchrist to the extent that Gilchrist did prove and is entitled to an award of damages for contract delay. We must amend the judgment, however,' to delete the award for home office overhead, thereby reducing the judgment award to $3,764,747.00. Otherwise, as amended, the judgment is affirmed. All costs of this appeal, in the amount of $7,515.00, are equally assessed to the parties. -
AMENDED, AND AS AMENDED, AFFIRMED.

. The project was actually a combination of two adjoining state projects, State Project No. 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, on Interstate 10 from the Cal-casieu Parish line to the U.S. 165 bridge, and State Project No. 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, on Interstate 10 from the Kayouchee Coulee Bridge to the Jefferson Davis Parish line. The length of the total project was 10.916 miles.

. Gilchrist subsequently reduced its claim to $4,195,127.00 during discovery.

. The assignments of error designated as C and D were not briefed by the DOTD and therefore are deemed abandoned. See Uniform Rules-Courts of Appeal, Rule 2-12.4(B)(4).

. Notably, Gilchrist agreed to accept Mr. Ivy as an expert in CPM scheduling and only objected "to his tender in any field other than critical path method scheduling.” (Emphasis added.)

. Article 702 was amended by 2014 La. Acts, No. 630, § 1, but the amendment made no change in the law; it simply revised the wording of the statute. See 2014 La. Acts, No. 630, § 2.

. Although a majority of the litigation centers primarily on issues related to the placement of the extra quantities of embankment, during the course of the project and by virtue of an attachment to its petition, Gilchrist also asserted a claim for approximately a thirty percent increase in the amount of lime used in the project. It was discovered during the course of the project, from laboratory testing as well as field observations, that the embankment would require type C lime treatment throughout the entire area where the new travel lanes were constructed.

. The DOTD’s own CPA expert, Michael Dai-gle, recognized in his testimony how Gilchrist had underbid two base course items, item # 302-01-A, which had a balanced bid cost of $77.64 per cubic yard, but Gilchrist bid $75 per cubic yard; and item # 302-02-C-01, which had a balanced bid price of $12.79 per square yard, but Gilchrist bid $12.50 per square yard. Our review of Gilchrist's estimate summary, which it used to make its bid, revealed several other items that were underbid by Gilchrist as well.

. Gilchrist was required to submit to the DOTD project engineer, prior to or at the preconstruction conference, a construction schedule giving a proposed schedule of operations that provided for completion of the work, a Summary of Activities tabulation, a Scheduled Earnings tabulation, and a Forty-Five Day Look-Ahead task list. The DOTD project engineer and Gilchrist then had to meet to review the proposed schedule and any revisions of the proposed schedule. The approved final schedule would then become what is called the baseline schedule.

. The "contract” consisted of the “Contract Documents,” which included the Project Construction Proposal. The Project Construction Proposal also consisted of various documents including Special Provisions, Supplemental Specifications, and the Schedule of Items.

. The standard specifications, also commonly referred to as the “red book,” is the Louisiana Standard Specifications for Roads and Bridges published by the DOTD. The 2000 edition was introduced at trial as a joint exhibit.

. A supplemental specification amended standard specification 203.14, regarding measurement of embankment, with language providing, in part, that "the contractor will take original cross sections for the entire length of the project." The supplemental specification further provided that measurement of quantities would be computed using the area bound by "the original ground line established by location (plan) cross sections (if accurate) or new original cross sections obtained by the contractor.”

.Gilchrist’s initial calculations indicated a 56,658 cubic yards deficit, but to verify its measurements, plan typical sections were used to create final template cross sections for end area calculations that revealed a total deficit of 63,945.91 cubic yards. However, because the initial cross section data clearly indicated that the planned quantity of embankment was "substantially less” than what was required for contract completion, but only a portion of the field cross-section data had been checked at the time, change order 19, dated October 22, 2007, was issued for an initial increase of embankment of 10,000 cubic yards, with the remaining deficit being covered by change order 41.

. The supplemental specification amending standard specification 203.14 further provided that "[t]he cross sections shall be taken in accordance with DOTD procedures, and re-suits must be furnished to the [DOTD] in a format satisfactory to the engineer.” (Emphasis added.)

. The production rate is a calculation of the quantity of work put in place divided by the units and time that it takes to do the work.

. According to Michael Latiolais, the CFO of Gilchrist, the lime costs associated with this item of damages was tied in with the embankment item code, 203-04, as lime that was purchased to facilitate speeding up the laying of embankment. The lime for which the DOTD issued change order 22 and for which Gilchrist asserted its claim for a time extension is specifically tied to the lime item code of S-304-03-B.

. As planned, the embankment work was scheduled to be completed in September 2008, but as built, the embankment work was completed in April 2008.

. Pinpoint page references are not provided as the publication page references are not available for the decision.

. See Harbor Construction Company, Inc. v. Board of Supervisors of Louisiana State Uni*1066versity and Agricultural and Mechanical College, 10-1663 (La.App. 4th Cir.5/12/11), 69 So.3d 498, 509-10; see also Bert K. Robinson, Construction Law: Elements of Contractor's Damages, 38 La. B.J. 247 (1990) (wherein the author notes in footnote 15 that at that time, no Louisiana decision had yet cited the Eichleay case).