STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

*Mut.*

NO. 2022 CA 0814

DARNELLE BORDELON ARCENEAUX

VERSUS

BRYAN DAVID ARCENEAUX

*CONSOLIDATED WITH*

NO. 2022 CA 0815

DARNELLE BORDELON ARCENEAUX

VERSUS

BRYAN DAVID ARCENEAUX

*Judgment Rendered:* **APR 0 3 2023**

* * * * * * * *

Appealed from the
17th Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Case No. C135630, 137974, Division C

The Honorable Marla M. Abel, Judge Presiding

* * * * * * * *

<table>
<tr><td>Claude F. Reynaud, Jr.<br>David Marshall Charlton<br>Jeanne C. Comeaux<br>Danielle L. Borel<br>Baton Rouge, Louisiana</td><td>Counsel for Plaintiff/Appellant<br>Darnelle Bordelon Arceneaux<br>Hargroder</td></tr>
<tr><td>Gregory E. Bodin<br>David G. Bayard<br>Baton Rouge, Louisiana</td><td>Counsel for Defendants/Appellees<br>Bryan D. Arceneaux, Colby D.<br>Arceneaux and Jean Pierre<br>Arceneaux</td></tr>
</table>

Hester J., concurs
Chutz J., concurs by CHH

Alan W. Stewart
James H. Gibson
Lafayette, Louisiana

Counsel for Defendants/Appellees
Todd M. Villarrubia, Todd M.
Villarrubia APLC and WPLG
Trust Protectors, LLC

\* \* \* \* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

\* \* \* \* \* \* \* \*

2

**THERIOT, J.**

In this suit for declaratory and injunctive relief, the plaintiff has appealed the trial court judgment on the merits after a bench trial, as well as the trial court's prior judgment denying her motion for summary judgment. For the reasons set forth herein, we affirm.

## FACTS AND PROCEDURAL HISTORY

Darnelle Bordelon Arceneaux ("Sammy")[1] and Bryan David Arceneaux were married on June 13, 1987. The parties created a number of companies during their marriage ("Arceneaux companies"), which produced substantial earnings. In the summer of 2016, Bryan and Sammy met with a New Orleans attorney and estate planner, Todd Villarrubia, to discuss estate planning, including the possible benefits associated with the creation of a trust. Over the next few months, Villarrubia developed an estate plan for the parties to accomplish their goals of "asset protection, minimiz[ing] estate taxes[,] and maintain[ing] control of assets." On September 21, 2016, Mervatt F. Eljaouhari, an associate in Villarrubia's firm, sent an engagement letter to Bryan and to the parties' adult son, Colby,[2] for their approval and signature. The engagement letter outlined the estate plan Villarrubia developed and the services to be provided by the firm, including, among other things, the creation of a Delaware dynastic generation-skipping trust for Bryan and Sammy, recapitalization of the ownership of several of the Arceneaux companies into a small number of voting interests and a much larger number of non-voting ownership interests, and execution of Acts of Donation, Acts of Sale, and promissory notes to transfer the non-voting ownership interests in the Arceneaux companies to the Delaware trusts. The engagement letter further advised that "[a]ll Donations and Sales need to be completed prior to 12/31/16 to avoid the new

---

[1] Sammy has remarried since this suit was filed and now goes by Sammy Hargroder.

[2] Villarrubia was simultaneously preparing a similar estate plan for Colby and his wife, Morgan.

Treasury Regs eliminating discounts for lack of control and marketability[.]" Although the engagement letter was addressed to Bryan and Colby and required signatures from both, only Colby signed and returned the engagement letter. The engagement letter was not addressed to Sammy,[3] and there was no signature line for her.

On October 10, 2016, Bryan and Sammy executed an agreement (the "Delaware trust agreement") prepared by Villarrubia's firm to create a Delaware trust named "The Bryan D. Arceneaux and Darnelle B. Arceneaux Irrevocable Trust" (the "Delaware trust").[4] The Delaware trust agreement designated the parties' children, Colby and Jean Pierre, as beneficiaries of the trust; Advocates Trust Services as administrative trustee; and WPLG Trust Protectors, LLC ("WPLG")[5] as trust protector. Schedule A to the Delaware trust agreement listed "Ten Dollars Cash" as the property Bryan and Sammy agreed to transfer to the Delaware trust.

In addition to Bryan and Sammy, the Delaware trust agreement was also executed by Colby, Jean Pierre,[6] and Villarrubia (as managing member of WPLG) on October 10, 2016. The agreement was not signed by Advocates Trust Services at that time, as Villarrubia's procedure for creating foreign trusts was to obtain all other necessary signatures and then send the executed documents to the administrative trustee for approval and signature. To that end, the signature page of the Delaware trust agreement for Bryan and Sammy provided: "This Irrevocable Trust Agreement is effective when signed by us, whether or not now signed by a Trustee." After the Delaware trust agreement was sent to Advocates Trust Services for approval and signature, Villarrubia began to reconsider his

---

[3] The engagement letter appears to have been mailed to a business address for the Arceneaux companies.

[4] Although there is no dispute that Bryan and Sammy both signed the Delaware trust agreement, there is conflicting testimony about whether it was signed by all parties in the presence of a notary and two witnesses.

[5] WPLG is an entity created by Villarrubia to serve as trust protector in irrevocable trusts he set up for his clients.

[6] The authenticity of Jean Pierre's signature is also disputed.

decision to use Advocates Trust Services due to a change in how their fees were calculated, and his firm began researching other possible Delaware administrative trustees in an attempt to find a more reasonable alternative. In early November, Villarrubia's search identified a potential administrative trustee, Premier Trust, Inc., located in Las Vegas, Nevada. Villarrubia and Eljaouhari discussed the idea of changing the Delaware trust to a Nevada trust with Bryan and Colby, who approved the change. Villarrubia's firm proceeded with creating a Nevada trust with Premier Trust as the administrative trustee, and the Delaware trust agreement was never signed by Advocates Trust Services or any other administrative trustee.

The Delaware trust agreement signed by the parties authorizes the trust protector, WPLG, to change the governing law or situs of the administration of the trust. The procedure for doing so is set forth in Section 15.04 of the Delaware trust agreement, which provides: "[t]he Trust Protector may elect, by filing an instrument with the trust records, that the trust will then be construed, regulated, and governed by the new jurisdiction's laws." However, WPLG never filed an instrument with the trust records. Rather than utilizing this provision, Villarrubia's firm prepared a new trust agreement (the "Nevada trust agreement"), which was also dated October 10, 2016 and almost identical to the Delaware trust agreement executed by the parties, except that it stated that the parties agreed to create a Nevada trust, governed by Nevada law, with Premier Trust as the administrative trustee (the "Nevada trust"). It does not appear that the Nevada trust agreement was ever sent to Bryan, Sammy, Colby, Jean Pierre, or Villarrubia to sign.

On December 1, 2016, Eljaouhari emailed a trust application to Premier Trust to create a Nevada trust with the same name as the parties' Delaware trust: "The Bryan D. Arceneaux and Darnelle B. Arceneaux Irrevocable Trust." The trust application provided by Eljaouhari contained only typewritten information about the parties and the trust and did not require any signatures. Attached to the

trust application was the Nevada trust agreement, including signature pages for Bryan, Sammy, Colby, Jean Pierre, and Villarrubia that appear to be photocopies of the October 10, 2016 notarized signature pages from the Delaware trust agreement.[7] The Nevada trust agreement was signed and accepted by Premier Trust as administrative trustee on December 15, 2016.

On December 1, 2016, Bryan and Colby executed a number of documents prepared by Villarrubia's firm as part of Villarrubia's estate-planning strategy, reorganizing certain Arceneaux companies and adopting or amending the operating agreements for certain Arceneaux companies. Bryan and Colby signed these documents in their capacities as officers or members of the Arceneaux companies, and Sammy was not involved in these transactions.

On December 27, 2016, Bryan and Sammy went to Villarrubia's office together and signed nine documents, including acts of donation and sales, which transferred certain community assets to Premier Trust as trustee of "The Bryan D. Arceneaux and Darnelle B. Arceneaux Irrevocable Trust." The acts of donation further identified the trust as "a Nevada inter vivos trust."

Sammy alleges that over the next eighteen months of the parties' contentious marriage, she gradually learned that Bryan had retained management and control of nearly all of their community property via the 1% voting interest in the Arceneaux companies and had been using that managerial control for his sole benefit, and to the detriment of the Arceneaux companies.

In September 2017, Sammy filed a petition for divorce, which she later dismissed when the parties briefly reconciled. Sammy filed a new petition for divorce on May 21, 2018 (the "divorce suit"), and the parties were divorced by a judgment dated December 20, 2018.

---

[7] Eljaouhari's email submitting the trust application noted that she was still waiting for the grantors' executed Personal Information Form ("PIF") and fee agreements. Although it is not clear exactly when these documents were submitted to Premier, the record reflects that Sammy's PIF was executed on December 2, 2016, and the parties' signed fee agreement was executed on March 3, 2017.

6

During the course of the divorce proceedings, Sammy requested a copy of the parties' trust documents from Villarrubia's firm. After several requests, an employee at Villarrubia's firm sent her a copy of the Delaware trust agreement, and upon review of the agreement she noticed that her signature on the document had been subsequently signed by a notary and witnesses outside of her presence. Months later, Villarrubia's office sent her a copy of the Nevada trust agreement, including the photocopied signature pages belonging to the Delaware trust agreement.

Following her receipt of the Nevada trust agreement and discovery of the existence of the Nevada trust, Sammy filed a separate suit entitled "Verified Petition to Declare Trust and Ancillary Transactions Null and Void and for Preliminary and Permanent Injunction" (the "trust suit"). Named defendants in the trust suit were Bryan, Colby, Jean Pierre, WPLG, Todd Villarrubia, in his capacity as managing member of WPLG, and Todd M. Villarrubia, APLC. In the trust suit, Sammy sought a declaration that the Nevada trust and all transfers thereto were null and void ab initio because the Nevada trust agreement was never signed by the parties and the signature pages were simply photocopied from another agreement. Sammy also sought a declaration that the Delaware trust and any transfers thereto were invalid and void ab initio because the Delaware trust agreement was not properly executed by authentic act. She also argued that her consent to the agreements was vitiated by error or fraud and that WPLG, the trust protector named in both trust agreements and given "massive powers and responsibilities" therein, was not a company organized under the laws of any state in the United States. In addition to a declaration of nullity, Sammy sought preliminary and permanent injunctions enjoining Bryan and Villarrubia (as managing member of WPLG) from "removing community property from the state of Louisiana, selling, diluting, devaluing, disposing of and/or encumbering community property, and

7

from diverting assets and corporate opportunities from community property companies to other companies owned by Bryan Arceneaux, until this matter is finally adjudicated."[8] The trust suit was consolidated with the divorce suit.

On July 2, 2021, Sammy filed a motion for summary judgment on her claims for declaratory relief, arguing that there are no genuine issues of material fact and that she is entitled to judgment declaring that the Nevada trust is invalid and of no force and effect, based on "the total absence of consent to enter into a Nevada trust agreement." In support of her motion, Sammy filed her own affidavit and the attachments thereto; excerpts from her deposition and the depositions of Villarrubia, Eljaouhari, Bryan, Colby, and Connie Bordelon (witness to the execution of the Delaware trust agreement), as well as the attachments to the depositions; and Bryan's amended discovery responses.

Villarrubia, Todd M. Villarrubia, APLC, and WPLG (collectively, "the Villarrubia defendants") filed a memorandum in opposition to Sammy's motion for summary judgment and incorporated a "motion to strike" in the opposition. The Villarrubia defendants did not file any supporting documents with their opposition to Sammy's motion for summary judgment. In their motion to strike, the Villarrubia defendants objected to Sammy's exhibits filed in support of her motion on the grounds that they contained parol evidence that should be inadmissible with regard to the unambiguous trust agreement.[9]

Bryan, Colby, and Jean Pierre also opposed Sammy's motion for summary judgment, arguing that the existence of the following genuine issues of material

---

[8] The trial court granted Sammy's request for a preliminary injunction in an April 24, 2019 judgment, which was later modified pursuant to agreement of the parties.

[9] The use of a motion to strike for this purpose is not appropriate. Louisiana Code of Civil Procedure article 966(D)(2) requires that any objection to a document filed in support of or in opposition to a motion for summary judgment shall be raised in a timely filed opposition or reply memorandum. Comment (k) of the Revision Comments 2015 to Article 966 states that this "provision changes prior law by specifically removing the motion to strike as a means of raising an objection to a document offered by an adverse party in support of or in opposition to a motion for summary judgment and does not allow a party to file that motion." The intent of La. C.C.P. art. 966(D)(2) was to make it mandatory that any objection to a document must be raised in a timely filed opposition or reply memorandum and not in a "motion to strike" or other pleading. *Ramus v. KCJS Trucking, LLC*, 2019-0041, p. 5 (La.App. 1 Cir. 9/27/19), 288 So.3d 869, 874.

fact precludes summary judgment on the issue of Sammy's lack of consent to create a Nevada trust: Sammy desired to create a trust for her sons' benefit; Sammy met with Villarrubia on three occasions to discuss the trust; Sammy signed a trust document to create a non-Louisiana trust; the trust document signed by Sammy gave WPLG the power and authority to change the situs of the trust; Sammy signed acts of donation and transfers to place property in a trust; and those acts of donation and transfers referenced "a Nevada inter vivos trust." In support of their opposition, they filed the following exhibits: Sammy's petition in the trust suit, in which she alleged that she met with Villarrubia on three occasions with regard to estate planning and trusts; Connie Bordelon's deposition testimony regarding a conversation she had with Bryan and Sammy about their plans to create a trust to protect their assets for their sons; Sammy's deposition testimony that she understood that she and Bryan were creating a trust to protect their assets and benefit their sons in the event of their deaths and that the documents she signed in Villarrubia's office on December 27, 2016 were in furtherance of that purpose, even though she was only shown the signature pages for the documents; and seven individual acts of donation executed by the parties on December 27 and 29, 2016, in which the appearance clauses identify "The Bryan D. Arceneaux and Darnelle B. Arceneaux Irrevocable Trust" as "a Nevada inter vivos trust."

A hearing was held on Sammy's motion for summary judgment on August 18, 2021. The trial court overruled Villarrubia's objection to Sammy's exhibits,[10] and after arguments by counsel, the trial court denied Sammy's motion for summary judgment, finding that the issue of consent is fact-intensive and requires credibility determinations that are inappropriate for summary judgment.

---

[10] Although the Villarrubia defendants' objections were not properly raised in accordance with La. C.C.P. art. 966(D)(2), since the trial court overruled the objections, any error in the consideration of the objections was harmless.

9

Sammy filed an application for supervisory writs, seeking review of the trial court's denial of her motion for summary judgment, which was denied. *Arceneaux v. Arceneaux*, 2021-1340 (La.App. 1 Cir. 1/21/22), 2022WL190292 (unpublished). Thereafter, a bench trial was held on the trust suit on March 28, 2022.[11] Villarrubia testified at the trial both in his individual capacity as an attorney and as a representative of the trust protector, WPLG. Villarrubia testified that he met with Bryan and Colby on two occasions in September 2016. Although Villarrubia testified that he had little independent recollection of the details of the meetings, his records contain typewritten notes of the meetings, which he reviewed for his testimony and which were introduced into evidence at trial.

Villarrubia met with Bryan and Colby on September 13, 2016 to gather information and discuss estate planning for Bryan and Sammy and for Colby and his wife. Sammy was not present at this meeting, and Villarrubia testified that he did not believe that he had met with her yet at that point. The September 13, 2016 meeting notes contain details about the Arceneaux companies, financial matters, and the parties' estate planning goals. Villarrubia met with Bryan and Colby again on September 20, 2016 to begin formulating an estate plan for the parties. His notes from this meeting detail the estate plan and the actions to be taken to execute it, which were later set forth in the engagement letter sent by Eljaouhari to Bryan and Colby. Although the meeting notes also state that Villarrubia's paralegal would set up a conference call for him with Bryan and Sammy "to discuss the design of an updated will, Living Will, General POA & Healthcare POA to protect their family," as well as an appointment to execute those documents, it is not clear from the record whether this ever took place.

---

[11] Although the trust suit was consolidated with the divorce suit, the matters were bifurcated for trial by agreement of the parties.

Villarrubia testified that Eljaouhari, an associate at his firm with three or four years of experience and an MBA, was the firm's "responsible attorney" on the Arceneaux estate planning file. In that capacity, Eljaouhari was "responsible for overseeing day to day efforts . . . of the trust." Although Eljaouhari was involved in the drafting of the Delaware trust agreement, Villarrubia reviewed and approved the agreement before it was sent out for signatures. Villarrubia testified that his whole team met weekly to go through all of their files together, and he was very comfortable with Eljaouhari handling the Arceneaux matter because she "had done this with several other clients without any problems."

Villarrubia testified that the estate planning work performed by his firm in this matter would normally take six months to complete, but due to concern about impending potential changes in federal estate tax exemption laws, everything needed to be completed within about three months, by December 31, 2016. Due to this urgency, Villarrubia primarily communicated with Colby, because he was the one "spearheading" the estate planning and was very responsive to questions and gathering necessary documents. Villarrubia also communicated with Bryan, but less frequently than Colby because Villarrubia knew Bryan was busy. Even though Villarrubia believed that "in all likelihood" Sammy was also his client, he did not communicate directly with her. He admitted that he did not explain the impact setting up the trust would have on her interest in the community property or discuss the potential change in situs and governing law with Sammy. He explained that he believed that communicating with the clients was Eljaouhari's responsibility.

Villarrubia testified that when setting up irrevocable trusts for his clients, he typically drafted trust documents to give the trust protector very broad powers in order to have as much flexibility as possible to make any kind of changes necessary as the need arises. As an example, Villarrubia explained that the trust

11

protector "can change beneficiaries, can move jurisdictions, can change aspects of the trust, distribution provisions, whatever with the client's approval of course." Villarrubia testified that when the cost issue arose with Advocates Trust Services and he found a reasonable alternative in Premier Trust, he made the change from Delaware to Nevada after receiving authority from Bryan and Colby. However, Villarrubia was not sure whether he made the change in his capacity as trust protector or as the parties' attorney. Despite the fact that Section 15.04 of the Delaware trust agreement prepared by his firm provided a procedure for the trust protector to change the situs and governing law of the trust, Villarrubia testified that he did not follow that procedure and instead changed the original trust document to specify a different jurisdiction. Villarrubia opined that as a result of his actions in changing the trust agreement, a Nevada trust was created, and the Nevada trust's existence was retroactive to October 10, 2016, the date the Delaware trust agreement was signed.

Villarrubia acknowledged that the signature pages attached to the Nevada trust agreement (including his own signature) appeared to be the same signature pages attached to the Delaware trust agreement, but denied any knowledge of how exactly they came to be attached to a different document. Nevertheless, he testified that he did not think it was necessary for the parties to sign the Nevada trust agreement because they had already signed a trust agreement and he "thought that that was still a valid trust, because we informed Bryan and Colby of the changes and we assumed they would talk to Sammy about them as well." He further explained that in his experience, most of the time clients rely on his guidance about the best structure for the trust and do not care about the situs of the trust as long as their assets are protected.

Villarrubia testified that Bryan and Sammy came to his office on December 27, 2016 to sign the transfer documents. He testified that his standard practice is to

review all documents with clients when they are signing and to pass around each document (not just the signature page) as he explains it. As Bryan and Sammy were signing the transfer documents, he explained what they were doing, i.e., donating stock to the trust or selling an interest to the trust. He admitted that he did not ever explain to Sammy that the Delaware trust had been replaced by a Nevada trust or that the agreement the parties signed had been replaced by a new trust agreement with their signatures reused. However, he testified that he referred to the trust as a Nevada trust when diagramming the transactions to show how assets were being transferred. Although Villarrubia seems to imply that Sammy should have been alerted to the fact that a change had been made by references he made to the parties' trust as a "Nevada trust" while the parties were signing the transfer documents, he acknowledged that some parts of the transfer documents prepared by his firm still contained references to Delaware law that were not caught in the proofreading process.[12]

Eljaouhari testified[13] that she started working for Villarrubia right after passing the bar exam in 2013, and was an associate at Villarrubia's firm for about three years before leaving the firm. Because she was a new attorney and not yet eligible to become board certified in estate planning, she shadowed other attorneys and was responsible for client communication, collecting information, and assisting with drafting documents. Over time, she gradually began to handle client meetings, "if it wasn't something that was too complex," and draft some trust documents on her own, although she always submitted them to Villarrubia for approval. Eljaouhari testified that when she worked with married couples on estate planning matters at Villarrubia's firm, the protocol was to request that both spouses

---

[12] The two acts of sale executed by Bryan and Sammy on December 27, 2016 each reference a promissory note "attached hereto and made part hereof." Those promissory notes, executed by Premier Trust, state that they are "governed by Delaware law."

[13] Because Eljaouhari was out of the country at the time of trial, the parties agreed to introduce her deposition in lieu of live testimony.

be present at meetings so that they could discuss things and make decisions together about how to proceed. If the parties disagreed about things or one person felt uncomfortable, she might suggest that they retain separate counsel. However, Eljaouhari testified that Villarrubia was the responsible attorney for Bryan and Sammy's estate planning because it was a complicated, high net worth matter that required a tax attorney and was not something she could handle alone. Her role in this matter was simply to draft documents as instructed by Villarrubia. She denied that she was responsible for client communications, although she did communicate with the clients on occasion when she needed additional information or signatures. She recalled communicating with Bryan and Colby, primarily by email, but she did not recall ever communicating with or meeting Sammy. She explained that she assumed that Villarrubia would have communicated with Sammy since he was the responsible attorney and the one who handled the meetings with the clients. Nevertheless, she agreed that all parties should have been included in the communications about estate planning.

After the parties executed the Delaware trust agreement, Eljaouhari worked with Advocates Trust Services through at least early November, gathering all of the documents and information they requested in order to review and accept the assignment as administrative trustee of the Delaware trust. She could not specifically recall what caused them to begin looking for a different administrative trustee after the parties executed the trust agreement, but thought that cost might have been the issue. She also could not recall why they chose an administrative trustee in Nevada, rather than one in Delaware, but testified that she "definitely didn't do it on [her] own without communicating with the clients." Although she was not aware of any power of attorney that would allow Colby to act on his parents' behalf and she testified that she was certain she would have communicated with "the clients," Eljaouhari did not remember if she discussed the

14

change with Bryan or only with Colby, and she did not know whether any of the information "trickled down to Sammy." In a November 28, 2016 email to Colby about possible jurisdictions for the trust, Eljaouhari provided a link to a Dynasty Trust State Rankings Chart, which compared and ranked the states that permit dynasty trusts on a number of criteria. Although the chart showed that a Nevada trust would be protected against divorcing spouses, while a Delaware trust would not, Eljaouhari testified that she did not know that there was a possibility of divorce in this case and so she did not consider that as a factor in recommending the change to Nevada. She acknowledged that "the safest option" when making a change in trust situs and governing law for a married couple would have been to inform both spouses of the possible impact on their community property rights, but testified that she assumed that Villarrubia communicated that information to the clients.

Once a decision was made to change to a Nevada trust with Premier Trust as the administrative trustee, Eljaouhari emailed Colby on November 28, 2016, stating that she would "have all necessary forms sent over to [him] tomorrow to make the switch." Eljaouhari testified that she was not sure if it was necessary under Nevada law that the parties sign the Nevada trust agreement, but she would have sent it to the parties for new signatures in any event because the document they had previously signed had been changed. However, due to the hectic nature of the events surrounding this "last minute switch," Eljaouhari could not say for certain that she actually sent the Nevada trust agreement to the parties or, if she did, whether new signatures were ever received from the parties. Eljaouhari admitted that she might have submitted the Nevada trust agreement to Premier Trust with the signature pages from the Delaware trust agreement attached "just to get the ball rolling" on the review process, with the intention of attaching new signature pages to the Nevada trust agreement at a later date when they were

15

received. However, she did not know whether anyone talked to the parties about reusing the signature pages in this way.

Sammy testified that in 2016, she and Bryan had conversations about estate planning in general, and she understood that the goals were to protect their assets from creditors and minimize estate taxes for the children in the event of their deaths. She did not recall whether she knew that Bryan and Colby were meeting with Villarrubia or engaging Villarrubia's firm to help with the estate planning, and she never saw the engagement letter detailing the estate planning services to be provided by the firm. She testified that all she really knew was that they were going to set up a trust to benefit their children. She did attend one meeting with Bryan in Villarrubia's office in either late September or early October of 2016. She recalled that the meeting was no more than an hour long and they talked about tax benefits for the children and the urgency of completing everything before the end of the year. She remembered hearing the word "dynasty" used in reference to the trust, but did not remember a discussion of different states relative to the trust. Sammy testified that it did not seem to her that the details of the estate planning strategy had been worked out at the time of the meeting she attended. Sammy did not tell Villarrubia that there was a possibility that she would file for divorce at some point in the future or ask whether there might be any negative consequences for her as a result of the estate plan and creation of the trust. She explained that the parties were working on their problems like they always had throughout their marriage and there was no divorce planned at that time. She testified that she believed that Villarrubia was her attorney and, since he represented her, anything he prepared would be favorable to her.

Sammy testified that she signed the Delaware trust agreement on October 10, 2016 in Bryan's office. According to Sammy, Connie Bordelon[14] called her on

---

[14] Bordelon is married to Sammy's brother and has worked for the Arceneaux companies for many years.

that day, asking her to come to Bryan's office to sign some papers that had to be mailed out by that night. When Sammy arrived, Bordelon had the signature page marked with a tab and showed her where to sign, which was typical of how they normally handled documents requiring Sammy's signature. She testified that she also signed Jean Pierre's name on his signature page, since he was in school and it was an urgent matter. Sammy testified that when she signed the document, only Bordelon was present, and she did not take the document to the notary's office to be notarized.

Sammy testified that she had no knowledge of the Nevada trust agreement being prepared or the creation of a Nevada trust. No one ever talked to her about changing the Delaware trust to a Nevada trust after the Delaware trust agreement was signed. No one told her about a new trust agreement being prepared or asked her about reusing her signature on a new agreement, and she was not provided a copy of the Nevada trust agreement submitted to Premier Trust. Sammy did not receive any communication from or even know anything about Eljaouhari until Eljaouhari's deposition was taken in connection with this suit. Sammy also had no knowledge of the December 2016 transactions by which Bryan and Colby reorganized or recapitalized certain Arceneaux companies as part of the estate planning strategy developed by Villarrubia.

Sammy testified that at the end of December 2016, she received a last-minute call that she needed to hurry and go to Villarrubia's office "because it was the end of the year and they were trying to get all this stuff finished up for the trust . . . before the end of the year . . . for the companies to receive benefits on taxes or whatever." She recalled that when she went to Villarrubia's office on December 27, 2016 as instructed, Villarrubia sat across from her and Bryan and two other gentlemen with a stack of papers to his left that needed to be signed. Sammy recalled that when Villarrubia picked up the first document, he noticed an error or

something that needed to be changed, so he called in a paralegal or assistant and asked her to make changes to the document. Villarrubia kept the signature pages separate from the document and passed them around for Bryan and Sammy to sign while the corrections were being made. Sammy testified that the majority of the documents ended up needing correction, and Villarrubia continued to pass around signature pages without the rest of the document attached. Villarrubia did not explain the documents being signed, and there was nothing on the signature pages given to her for signature that gave her any information about the substance of the documents. All she knew was that the documents were necessary for the trust and had to be signed by the end of the year. She testified that she trusted Villarrubia as her attorney, so she signed the pages he asked her to sign. Throughout this process, Sammy believed that the trust being discussed was the Delaware trust they had signed documents for in October, because that was the only trust agreement she had ever signed, no one had ever talked to her about changing the Delaware trust to a Nevada trust, and nothing she saw that day in Villarrubia's office alerted her to the existence of a new trust.

Bryan testified[15] that he and Sammy had multiple discussions regarding the trust prior to its execution on October 10, 2016, although he did not provide details about the substance of these discussions. Brian testified that he and Sammy executed the Delaware trust agreement on October 10, 2016, in the presence of notary Sheila St. Pierre and two witnesses. He also saw Jean Pierre sign the agreement, but could not recall if the witnesses were present at the time. Bryan testified that at some point after the parties signed the Delaware trust agreement, Villarrubia "started talking about the Nevada Trust being a better trust due to some reasons." However, Bryan could not remember exactly when this occurred or why Villarrubia recommended changing to a Nevada trust. Nevertheless, he testified

---

[15] Some of Bryan's trial testimony was entered into the record in the form of stipulations.

that he never received a signature page to sign for the Nevada trust agreement. Although he seemed to have been aware of the change to a Nevada trust, Bryan testified that when he went to Villarrubia's office on December 27, 2016 to sign the transfer documents, he never noticed that some of the documents still contained references to Delaware law.

Colby testified that Sammy and Morgan were not included in the September meetings with Villarrubia because a lot of the discussion concerned the Arceneaux companies, including the need for recapitalization or reorganization of the companies, and Sammy and Morgan were not involved in the operation of the Arceneaux companies. Although Sammy was not present when the details of the estate planning strategy were being discussed, Colby testified that at some point prior to the execution of the Delaware trust agreement, he had a discussion with her about the nature of the estate plans and the plans for the trust. He testified that she asked a number of what he considered to be "normal questions" in the nature of "Who controls what? Where's the value? What happens if this or this does not happen?" He also recalled that he mentioned the need to reorganize or recapitalize the Arceneaux companies to Sammy. During their discussions prior to the execution of the trust, Sammy never mentioned that she did not understand or was not in favor of what was going on. He also recalled one meeting he had with Villarrubia to discuss estate planning and trusts where Sammy was also present, but testified that no details of the estate planning strategy had been decided at that point. Colby was not present when his parents executed the Delaware trust agreement, as he signed before a different notary close to his home. Colby recalled another discussion with Sammy, which took place in the summer of 2017 after all of the trust transactions had been completed, where she asked him questions about the details of the trust, such as how she was protected in a liquidity event and what would happen to the money. Although at the time, Colby thought these were

19

normal questions, he later came to believe that her questions were prompted by her plans to file for divorce.

Colby testified that he was involved in the decision to change the situs of the trusts (both his own and his parents') to Nevada. He discussed the choice of jurisdiction with both Eljaouhari and Villarrubia and also did his own due diligence. He testified that a number of jurisdictions were considered for the trusts based on several variables, including duration, whether perpetual trusts were allowed, and state income tax. Villarrubia's firm ultimately recommended Nevada as the situs for the trusts, and Colby accepted their recommendation. His recollection was that Nevada was determined to be preferable to Delaware due to a material difference in the fees charged by the administrative trustee and preferable to other jurisdictions because there was no state income tax in Nevada. After the decision was made, Eljaouhari sent him an email on November 28, 2016, stating that she would "have all necessary forms sent over to [him] tomorrow to make the switch;" however, Colby did not recall receiving anything from her in that regard, nor did he recall ever signing a new trust agreement for his own trust or his parents' trust or being asked for permission to reuse his signature page. Although Colby was copied on Eljaouhari's December 1, 2016 email transmitting the trust application and Nevada trust agreement (with photocopied signature pages) to Premier Trust, it is unclear from his testimony whether he noticed at that time that the signature pages to the Nevada trust agreement were photocopies. In any event, he testified that he did not realize the lack of original signatures on the Nevada trust agreement was an issue until the trust suit came about and did not ask anyone about it.

Mark Drescheler, chairman, CEO, and president of Premier Trust, testified at the trial via Zoom. Premier Trust received the trust application and Nevada trust agreement by email from Eljaouhari on December 1, 2016. Drescheler testified

20

that these documents were sent for Premier Trust's review from an administrative perspective, to decide whether to accept the appointment as administrative trustee. The trust application was ultimately accepted, and Premier signed and returned the trust agreement on December 15, 2016. Drescheler testified that Premier Trust does not require that original trust documents be submitted and does not review trust documents to determine whether the signatures are original to that particular document; however, he testified that they do not accept trust documents for review that have not been signed by the grantors. Further, Drescheler testified that if Premier Trust had known that the signature pages of the Nevada trust agreement submitted by Eljaouhari for review and acceptance were taken from the Delaware trust agreement, they would not have accepted the appointment as administrative trustee.

Sheila St. Pierre, the Louisiana notary who notarized Bryan, Sammy, and Jean Pierre's signatures on the Delaware trust agreement, testified that all three parties signed the document in her office, in her presence and in the presence of the two witnesses. Although St. Pierre did not keep records about documents she notarized or fees charged, she estimated that she had notarized between five hundred and one thousand documents for the Arceneaux companies over the years. Nevertheless, she testified that she specifically recalled this particular occasion. However, St. Pierre's recollection of some of the details in this matter, such as who was present or the day of the week or time of day the parties appeared, differs from other witnesses and appears to be inaccurate. St. Pierre was questioned about allegations that she sometimes notarized documents for the Arceneaux companies without the signatories present. While St. Pierre acknowledged that she sometimes notarizes "trivial transactions" without seeing all of the signatories and witnesses sign, she testified that she considered this authentic act to be important and she was certain that Sammy signed it in her presence because she specifically recalled

seeing her on that day. Although she did not review the document she notarized on October 10, 2016 and therefore could not say whether it was a Delaware or Nevada trust agreement, she denied ever notarizing a second trust agreement on a different occasion for the parties.

Bryan and Sammy's younger son, Jean Pierre, testified at trial regarding the circumstances of the execution of the Delaware trust agreement. Jean Pierre testified that in the fall of 2016, his parents talked to him about forming a trust that would benefit him and Colby in the event of their deaths. On October 10, 2016, his mother asked him to drive to St. Pierre's office from school to sign a trust document. When he arrived, Bryan and Sammy were both in St. Pierre's office with St. Pierre. Jean Pierre could not recall whether he saw the witnesses, Connie Bordelon and Danielle Cheramie, at any point while he was at St. Pierre's office signing the Delaware trust agreement. Although Jean Pierre could not recall whether he actually saw the whole document or just a signature page, he understood that he was signing a trust document on that date.

Connie Bordelon testified that she has worked for Bryan at one of the Arceneaux companies since 1998 and has been married to Sammy's brother for forty years. Bordelon knew from conversations with Bryan and Sammy that they were discussing estate planning and putting their assets into a trust to protect their assets and benefit their children in the event something happened to them. On October 10, 2016, Bordelon and a coworker, Danielle Cheramie, drove to St. Pierre's office at Bryan's request and signed the Delaware trust agreement as witnesses to the signatures of Bryan, Sammy, and Jean Pierre. Bryan and Sammy were both already present in St. Pierre's office when she and Cheramie arrived, although she did not specifically recall whether she actually saw them sign the agreement. Although she and Cheramie also signed as witnesses to Jean Pierre's signature, Bordelon did not see Jean Pierre while she was in St. Pierre's office.

22

Bordelon testified that Sammy told her that Jean Pierre was on his way there from school, so she signed his signature page and left before he arrived. Bordelon denied ever being asked to sign a second trust agreement. Other than in the case of Jean Pierre's signature to the Delaware trust agreement, Bordelon denied signing as a witness on documents that had to be notarized without actually observing the person sign.

Sammy's sister, Rachel Turchin, testified about her experience with witnessing signatures as an employee at one of the Arceneaux companies. Although Turchin was not involved in the signing of the Delaware trust agreement, she testified that during her employment from 2007 to 2016, she was frequently called upon to sign documents as a witness. According to Turchin, she and other employees were regularly approached by Bordelon and presented with blank signature pages and instructed to sign as a witness, with the other signatures to be added later. Turchin testified that even though she understood that she was supposed to witness someone signing a document before signing as a witness, that never happened while she worked for the Arceneaux companies.

Following the conclusion of the bench trial, the trial court took the matter under advisement and thereafter dismissed all claims in Sammy's trust suit with prejudice and declared that the Bryan D. Arceneaux and Darnelle B. Arceneaux Irrevocable Trust and all community property transfers thereto are valid and enforceable.[16] In written reasons for judgment, the trial court made the following findings, "based on the testimony from the . . . witnesses, which the court found to be the most credible": the Delaware trust agreement was properly executed by authentic act; the Delaware trust agreement was effective when signed by the parties, regardless of the fact that Advocates Trust Services never signed the

---

[16] The original judgment signed by the trial court on April 7, 2022 was later amended pursuant to a rule to show cause order issued by this court in accordance with La. C.C.P. arts. 1918 and 2088(A)(11) and (12). The trial court issued an amended judgment on September 22, 2022, to provide proper decretal language and to certify the judgment as final under La. C.C.P. art. 1915(B).

agreement; the Delaware trust agreement gave WPLG the authority to change the situs of the trust from Delaware to Nevada; Villarrubia, on behalf of WPLG, changed the situs of the trust from Delaware to Nevada; Villarrubia "explained to [Sammy] what was happening each time he met with her[;]" Sammy's self-serving testimony that she did not know or understand what she was signing when she executed the donations and property transfers to the trust on December 27, 2016 was insufficient to prove that she was deceived; and the donations and property transfers executed by the parties on December 27, 2016 independently created a Nevada trust under Nevada law.

Following the issuance of the trial court's judgment, Sammy appealed both the denial of her motion for summary judgment and the trial court's judgment on the merits denying her request to declare the trust and ancillary transactions null and void.

On appeal, Sammy argues the trial court erred in: (1) applying the Nevada choice of law provision found in the unexecuted Nevada trust agreement, and then applying a Nevada constructive trust statute that is inconsistent with Louisiana law in order to uphold the Nevada trust agreement or create a new constructive trust; (2) finding the unexecuted Nevada trust agreement enforceable, even though all parties and witnesses admitted that they only signed a Delaware trust agreement and no new signature pages were obtained by the Villarrubia firm; (3) ignoring Villarrubia's testimony against self-interest that the Delaware trust never came into existence because it was not accepted by the proposed administrative trustee and that he did not use his authority as trust protector under the Delaware trust agreement to change the situs of the trust to Nevada pursuant to the procedures outlined in the Delaware trust agreement; (4) ignoring Eljaouhari's testimony that the Nevada trust agreement needed to be specifically and separately executed by the parties; (5) ignoring the improper re-use of the signature pages from the

24

Delaware trust agreement to create the Nevada trust; (6) ignoring the uncontroverted evidence that Villarrubia and Eljaouhari did not inform Sammy about the nature of the trust agreements being drafted or the decision to form a Nevada trust instead of a Delaware trust; (7) relying on its finding that the Delaware trust was properly executed by authentic act, when Villarrubia testified that the Delaware trust never came into existence because the proposed administrative trustee declined the appointment; (8) crediting the testimony of certain witnesses regarding the execution of the Delaware trust agreement despite numerous internal inconsistencies and implausible versions of facts by the unreliable witnesses; and (9) denying Sammy's motion for summary judgment.

## DISCUSSION

We will first address Sammy's argument that the trial court erred in finding that the Delaware trust agreement was properly executed by authentic act.

Louisiana Revised Statutes 9:1752 provides that "[a]n inter vivos trust may be created only by authentic act or by act under private signature executed in the presence of two witnesses and duly acknowledged by the settlor or by the affidavit of one of the attesting witnesses." An authentic act is a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed. La. C.C. art. 1833(A). It is not necessary that the writing be executed at one time or place, or before the same notary public or in the presence of the same witnesses, provided that each party who executes it does so before a notary public or other officer authorized to perform that function and in the presence of two witnesses and each party, each witness, and each notary public signs it. La. C.C. art. 1833(B).

25

The purpose of the authentic act requirements is to ensure the validity of a signature on a document and that the person whose name appears on a document is the person who actually signed the document. *Villenuve v. Cash*, 2016-1530, p. 6 (La.App. 1 Cir. 9/21/17), 231 So.3d 682, 687. Any material deviation from the requirements governing authentic acts is fatal. *Villenuve*, 2016-1530 at p. 4, 231 So.3d at 685. A party seeking to invalidate an apparently authentic act must present strong and convincing proof of such magnitude as to overcome the presumption of verity of notarial acts. *Eschete v. Eschete*, 2012-2059, p. 3 (La.App. 1 Cir. 2/27/14), 142 So.3d 985, 987.

Although Sammy admits that she signed the Delaware trust agreement, she denies that she signed it in the presence of a notary and two witnesses. However, other evidence presented by the defendants at trial contradicted Sammy's assertions that the Delaware trust agreement was not executed as an authentic act.

It is clear that after considering all of the evidence and the conflicting testimony at trial, the trial court was called on to make a credibility determination, which it did, finding the testimony of other witnesses to be more credible than Sammy's. The trial court believed the testimony of Bordelon and St. Pierre, who it noted were "both disinterested in the outcome of this case," that Bryan and Sammy signed the agreement in St. Pierre's office with Bordelon and Cheramie present. The trial court noted that Sammy was the only witness who testified that the document was not signed in St. Pierre's office and found her testimony in that regard to be "self-serving and not credible."

Where findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trial court's findings of fact. Indeed, where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can

26

virtually never be manifestly erroneous. *Manchester v. ANPAC Louisiana Insurance Co.*, 2018-1379, p. 5 (La.App. 1 Cir. 5/31/19), 278 So.3d 993, 997.

We find no error in the trial court's conclusion that the Delaware trust agreement was a properly executed authentic act. This finding is reasonably supported by the record and is not manifestly erroneous. Moreover, we will not disturb the findings of the trial court as the factfinder, who listened to the testimony of all of the witnesses and has vast discretion in determining the weight and credibility of each witness. See *LeBlanc v. Elam*, 2022-0105, pp. 7-8 (La.App. 1 Cir. 11/4/22), 355 So.3d 21, 27.

Sammy next argues that even if the Delaware trust agreement was properly executed, the Delaware trust never came into existence because the Delaware trust agreement was never executed by an administrative trustee. By extension, Sammy argues that the trial court erred in finding that the situs of the Delaware trust was changed from Delaware to Nevada because there never was a Delaware trust.

The Delaware trust agreement provides, immediately above Bryan and Sammy's notarized signatures:

> We have executed this trust on October 10, 2016. This Irrevocable Trust Agreement is effective when signed by us, whether or not now signed by a Trustee.

> We certify that we have read and understand this Irrevocable Trust Agreement, and that it correctly states the provisions under which our trust property is to be administered and distributed by the Trustee.

Thus, according to the terms of the agreement signed by Bryan and Sammy, the Delaware trust agreement's provisions were effective from the time Bryan and Sammy signed the agreement, regardless of whether or not it had been signed by an administrative trustee.

Under the terms of the Delaware trust agreement, the trust protector (WPLG) has the power to amend or modify the agreement and to change the governing law of the trust or change the situs of administration of the trust from

27

one jurisdiction to another. However, the provisions of the Delaware trust agreement that grant these powers to the trust protector also include procedural requirements for the exercise of the powers by the trust protector. Section 5.11(a) of the Delaware trust agreement gives the trust protector the power and authority to make amendments or modifications to the agreement, subject to certain limitations; however, this grant of authority requires that any amendment must be made in writing and signed by the trust protector and the trust protector must deliver a copy of the amendment to the primary beneficiaries and trustees of the amended trust. Section 5.11(b) gives the trust protector the power to "change the governing law of the trust . . . or change the situs of administration of the trust from one jurisdiction to another as more specifically set forth in Section 15.04 of this instrument." Section 15.04 provides, in pertinent part:

> At any time, the Trust Protector may change the governing law of the trust; change the situs of the administration of the trust; and remove all or any part of the property from one jurisdiction to another. The Trust Protector may elect, *by filing an instrument with the trust records*, that the trust will then be construed, regulated, and governed by the new jurisdiction's laws. The Trust Protector may take action under this Section for any purpose the Trust Protector considers appropriate, including the minimization of any taxes in respect of the trust or any trust beneficiary. [emphasis added]

Villarrubia testified at trial that he changed the parties' Delaware trust to a Nevada trust governed by Nevada laws; however, he testified that he was unsure whether he did so in his capacity as trust protector (on behalf of WPLG) or as the parties' attorney. Villarrubia admitted that he did not file an instrument with the trust records as required by Section 15.04 in order for the trust protector to change the governing law and situs of administration of the trust. He testified that he effected the change by changing the trust agreement instead. Although the trust protector also has general authority under Section 5.11(a) to modify or amend the trust agreement, there is no indication in the record that Villarrubia complied with the procedural requirements to do so, i.e., that the amendment was in writing and

28

signed by the trust protector and that he delivered a copy of the amendment to the primary beneficiaries and trustees of the amended trust. While the Nevada trust agreement could arguably be construed as a written amendment to the agreement, Villarrubia admitted that he did not sign the Nevada trust agreement. Furthermore, it does not appear that a copy of the unsigned Nevada trust agreement was delivered to anyone other than Premier Trust. Although Villarrubia implied that he may have changed the trust agreement in his capacity as an attorney, he did not explain the source of his authority to do so and there was no evidence presented that either party granted authority to Villarrubia, as their attorney, to act on their behalf in this way. The record before us, viewed in its entirety, does not support the conclusion that Villarrubia changed the situs and governing law of the Delaware trust to Nevada under any valid authority, and the trial court's finding that he did was clearly wrong.

Sammy next argues that the trial court erred in apparently finding the Nevada trust agreement, which was never signed by the parties, to be valid and enforceable. Sammy assumes that the trial court found the Nevada trust agreement to be valid and enforceable because the trial court applied Nevada law (the choice of law set forth in the Nevada trust agreement) in order to conclude that a valid Nevada trust was created. Although a trial court's oral or written reasons for judgment form no part of the judgment, and appellate courts review judgments, not reasons for judgment,[17] we note that the trial court's lengthy factual findings did not include a finding that the Nevada trust agreement was a valid, enforceable agreement, nor was such a finding implied. Rather, the trial court determined that Nevada law was applicable pursuant to Louisiana's choice of law provisions.

There is no genuine dispute that the Nevada trust agreement was never executed by the parties. Since the Nevada trust agreement was never executed by

---

[17] *Wooley v. Lucksinger*, 2009-0571, pp. 77-78 (La. 4/1/11), 61 So.3d 507, 572.

the parties, the choice of law provision contained in Section 15.06(d) of the agreement is not applicable to the determination of whether the Nevada trust is valid. The trial court concluded, and the appellees argue, that Nevada law should apply to this dispute nonetheless. The appellees base their assertion that Nevada law should apply to this matter on the facts that the Delaware trust agreement was properly executed by authentic act; the Delaware trust agreement was effective once signed by the parties, even though it was not yet signed by a trustee; and the trust protector subsequently exercised his authority under the Delaware trust agreement to change the situs and governing law of the trust to Nevada. Since we have determined that the trial court's finding that the trust protector exercised his authority to change the situs and governing law of the trust was clearly wrong, the Nevada trust agreement is not determinative of the choice of law in this case.

Louisiana has not enacted a choice of law provision dealing specifically with trusts. However, the general articles of the choice of law provisions have been held to be broad enough to deal with the creation of an inter vivos trust. *Hilliard v. Marshall*, 91 F.Supp. 2d 916, 918 (W.D. La. 1999); see La. C.C. arts. 3515-3518. Louisiana Civil Code article 3515 provides:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

The relationships of the states to the parties and the dispute are as follows. The parties are Louisiana residents who executed a trust agreement in Louisiana, in accordance with the form requirements of the Louisiana Trust Code, in which the

30

parties agreed to create a Delaware trust governed by Delaware law. The parties then executed acts of donation and sales in Louisiana in which they transferred certain property subject to a Louisiana community property regime to a Nevada trustee, who in turn accepted the donations on behalf of a Nevada trust. The acts of sale transferred the property in consideration of promissory notes executed by the Nevada trustee, which provide (due to a drafting error by the attorney who prepared the notes) that the notes are to be governed by Delaware law. The property has been held in the Nevada trust and administered by the Nevada trustee since December of 2016.

In this case, the parties executed a trust agreement with the intention of creating a foreign trust in accordance with Louisiana law.[18] The evidence presented at trial was clear that the parties intended to place their community property in a foreign trust for the benefit of their children. By the terms of the agreement, the parties voluntarily subjected themselves and the trust property to the laws of Delaware. Importantly, they also gave authority and discretion to a third-party, WPLG, to change the governing law and situs of the trust from Delaware to another jurisdiction. Although WPLG (through Villarrubia) did not properly exercise that authority, the parties' agreement allowed for the possibility that the trust property would be moved by the trust protector to another state and subjected to the laws of that new state. Thereafter, the parties executed valid transfers of their property to a Nevada trustee to be placed in a Nevada inter vivos trust,[19] and the Nevada trustee accepted the donations and executed promissory

---

[18] Under Louisiana law, "foreign trust" means either a trust which by the terms of the trust instrument is governed by the law of a jurisdiction other than Louisiana or a trust of which the settlor was domiciled in a jurisdiction other than Louisiana at the time the trust was created. La. R.S. 9:2262.1(A). Although Louisiana law provides an exception to the form requirements set forth in the Louisiana Trust Code for certain foreign trusts, that exception is not applicable in this case. The exception to the form requirement applies to foreign trusts "executed outside this state in the manner prescribed by, and in conformity with, the law of the place of its execution, or the law of the settlor's domicile, at the time of its execution . . . provided the trust instrument is in writing and subscribed by the settlor." La. R.S. 9:2262.4.

[19] Although Sammy maintains that she did not know that she was transferring property to a Nevada trustee or a Nevada trust because she was only shown the signature pages to the acts of donation and sales, a person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he/she did

31

notes in consideration of the property sold. It appears that the justified expectation of the parties was that their trust would not be governed by the laws of Louisiana, but by the laws of Delaware or another jurisdiction selected by the trust protector. In light of the particular facts and circumstances of this case, there was no error in the trial court's finding that Nevada law should be applied to the suit to invalidate the trust and property transfers.

Under Nevada law, except as otherwise provided by specific statute or any regulatory or contractual restrictions, a trust may be created by a transfer of property by the owner during his or her lifetime to another person as trustee. NV ST 163.002(1)(b). Other requirements for a valid trust under Nevada law are that the settlor properly manifests an intention to create a trust, there is trust property, and the trust instrument[20] provides for a beneficiary or class of beneficiaries that is ascertainable with reasonable certainty or that is sufficiently described so that it can be determined whether a person meets the description or is within the class. NV ST 163.003 & 163.006(1). See Tsai v. Hsu, 126 Nev. 763, 367 P.3d 828 (2010) (the parties created a valid trust under Nevada law when they executed a quitclaim deed transferring all right, title, and interest in land to their minor children in trust, with the parties agreeing to act as co-trustees).

In this case, Bryan and Sammy transferred property during their lifetimes to Premier Trust as trustee of "The Bryan D. Arceneaux and Darnelle B. Arceneaux Irrevocable Trust . . . a Nevada inter vivos trust . . . in consideration of the natural love and affection which Donors have for their family who are the sole

not read it, or that it was not explained, or that he/she did not understand it. *Wagner v. DA Exterminating Co. of St. Tammany, Inc.*, 2020-0876, p. 9 (La.App. 1 Cir. 4/16/21), 324 So.3d 105, 111. The presumption is that parties are aware of the contents of writings to which they have affixed their signatures, and the burden of proof is upon them to establish with reasonable certainty that they have been deceived. If a party can read, it behooves him/her to examine an instrument before signing it. *Id.* The trial court found that Sammy's testimony that she did not know or understand what she was signing when she signed the acts of donation and sales was insufficient to carry her burden of proving that she was deceived. Reviewing the record in its entirety, we cannot say that the trial court's conclusion on this issue was manifestly erroneous or clearly wrong.

[20] Despite the reference to a "trust instrument," oral trusts may be validly created under Nevada law where the existence and terms of the oral trust are established by clear and convincing evidence, and in the case of an oral trust, the "trust instrument" refers to the terms of the trust as established by clear and convincing evidence. NV ST 163.009.

beneficiaries" of the trust. The acts of donation executed by Bryan and Sammy also referred to the beneficiaries, Colby and Jean Pierre, by name. On the evidence before us, we cannot say that Sammy carried her burden of proving that the Nevada trust was invalid under Nevada law. The trial court did not err in dismissing her claims in the trust suit.

Sammy also raised the denial of her motion for summary judgment on appeal. Generally, an appeal may not be taken from the trial court's denial of a motion for summary judgment. See La. C.C.P. art. 968 ("An appeal does not lie from the court's refusal to render any judgment on the pleading or summary judgment."). However, the denial of a motion for summary judgment may be reviewed on an appeal of a final judgment in the suit when the issue raised in the motion for summary judgment is raised again on appeal. *Gilchrist Construction Co., LLC v. State, Department of Transportation and Development*, 2013-2101, p. 7 (La.App. 1 Cir. 3/9/15), 166 So.3d 1045, 1051, *writ denied*, 2015-0877 (La. 6/30/15), 172 So.3d 1097. When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings, in addition to review of the final judgment. *Fonseca v. City Air of Louisiana, LLC*, 2015-1848, p. 5 n. 3 (La.App. 1 Cir. 6/3/16), 196 So.3d 82, 85 n. 3. Nevertheless, the Louisiana Supreme Court has made it clear that after a full trial on the merits, the standard of review utilized in reviewing the denial of a motion for summary judgment is not the same standard of review utilized by appellate courts in reviewing the grant of a summary judgment.[21] The Louisiana Supreme Court has explained that "once a case is fully tried, the affidavits and other limited evidence presented with a motion for summary judgment-later denied by the district court-are of little or no value." *Hopkins v. American Cyanamid*

---

[21] An appellate court reviews the granting of a motion for summary judgment de novo, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. *In re Succession of Beard*, 2013-1717, p. 10 (La.App. 1 Cir. 6/6/14), 147 So.3d 753, 759-60.

*Company*, 95-1088, p. 13 (La. 1/16/96), 666 So.2d 615, 624. Instead, the entire record should be reviewed by an appellate court. *Id.*

Thus, while the issue of the parties' lack of consent to enter into a Nevada trust raised by Sammy's motion for summary judgment is properly before us in this appeal, the limited evidence before the trial court at the time of its pre-trial ruling denying the motion and the de novo standard of review for summary judgments are no longer pertinent. The issue raised by Sammy in her motion for summary judgment must be considered by this court after review of the entire record. See *Browne v. State ex rel. Department of Transportation & Development*, 2015-0667 (La.App. 1 Cir. 2/4/16), 2016WL455938, *4, (unpublished), *writ denied*, 2016-0442 (La. 4/22/16), 191 So.3d 1044; see also *Moore v. Talbot*, 2008-1370 (La.App. 1 Cir. 2/13/09), 2009WL368619, *3, n. 4, (unpublished), *writ denied*, 2009-0553 (La. 4/24/09), 7 So.3d 1199. Our review of the entire record reveals that genuine issues of material fact existed as to Sammy's consent to the creation of the Nevada trust, such as Sammy's execution of a number of authentic acts transferring property to a Nevada inter vivos trust. Summary judgment was not appropriate on this issue.

**DECREE**

For the reasons set forth herein, we recall the rule to show cause, maintain the appeal, and affirm the October 14, 2021 judgment denying Darnelle B. Arceneaux's motion for summary judgment and the September 22, 2022 amended judgment dismissing all claims raised by Darnelle B. Arceneaux in the "Verified Petition to Declare Trust and Ancillary Transactions Null and Void, and for Preliminary and Permanent Injunction." Costs of this appeal are assessed to appellant, Darnelle B. Arceneaux.

**RULE TO SHOW CAUSE RECALLED; APPEAL MAINTAINED; AND AFFIRMED.**